# KATHRYN KEEGAN v. CHICAGO GREAT WESTERN RAILROAD COMPANY.[1]

May 20, 1932.

No. 28,812.

*Lamberton & Lamberton, Charles C. Spencer,* and *Samuel Cohen,* for appellant.

*Stearns, Stone & Mackey,* for respondent.

WILSON, C. J.

Plaintiff appealed from an order denying her motion for a new trial after a verdict had been directed for defendant.

Plaintiff's intestate, Christopher Keegan, was the foreman of a switching crew in defendant's yards at Oelwein, Iowa. Doty and Gureski were switchmen in the crew. Switchmen work under orders from the foreman. It is not meant that they always receive orders before they turn a switch or in reference to all details.

The defendant's lead track runs easterly and westerly, curving to the north as it goes west. A number of switch tracks meet the lead track from the west. They are numbered from the south toward the north.

[1]Reported in 243 N. W. 60.

On the night of October 17, 1930, there was a loaded refrigerator car and five empty cars standing on the lead track. The yard foreman directed Keegan to take these cars from the lead track and put them out of the way. It was left to Keegan to select a place. He opened the switch running from the lead onto switch track three and signaled his engineer to push the six cars onto track three. This was done. They were left there. A little later it developed that road engine No. 850 was in on track three behind the six cars, and it was necessary for this engine to get out on the main track. Keegan said to Gureski: "We are going to pick these [the six cars] up and let this fellow [the man with his engine] out of the yard." The switch for track three was then thrown, and the switch engine went in on track three, coupled onto the six cars, and pulled them southeasterly out on the lead track, and Keegan signaled them to stop. The road engine came off of track three onto the lead track, but there was not room enough. The switch engine moved the cars a bit farther. Then Gureski, in obedience to what Keegan had told him, as above stated, threw the switch for the lead track to let the road engine go out in a northwesterly direction, which it did.

After the road engine pulled up the lead to the northwest, Gureski, interpreting Keegan's statement to mean that the movement was solely to let the road engine out and supposing the six cars were to be put back on track three, threw the switch for track three. Keegan stood near by. The men used lanterns. Keegan could see from the switch light what Gureski had done. Whether he in fact did see it we do not know. He then signaled his engineer to back up the string of six cars, and he started walking northwesterly parallel with the lead track. Had Gureski not thrown the switch to divert the cars onto track three they would have gone up the main lead; but, the switch being so thrown by Gureski, the cars were diverted back onto track three, and as Keegan was walking across track three he was struck down.

Keegan was engaged in interstate commerce, and the action is brought under the federal employers liability act.

Gureski threw the switch to route the cars back on track three because he thought that was what Keegan wanted. He construed Keegan's statement to mean that.

No one suggests any possible reason for the cars not being put back on track three. If, as claimed, Keegan, unbeknown to Gureski, gave Doty other instructions as to movements, it is immaterial. It would not be negligence for Gureski to act contrary to directions given Doty by Keegan and of which Gureski had no notice or knowledge.

We are of the opinion that Gureski's understanding and conduct under the circumstances was that of an ordinarily prudent man. Keegan, being foreman, was responsible for the movements. There is no basis for holding the defendant guilty of negligence through the action of Gureski; and we agree with the trial court that "if there was any negligence, it was on the part of decedent in not making his instructions more explicit."

Affirmed.

STONE, J. took no part.

DIBELL, J. (dissenting).

I do not quite agree with what are taken to be the established facts at the moment of the accident. The decedent intended the cars to go north—not back onto number three. Work was to be done at the north. The evidence is that it was for the foreman to direct the movements of the cars as they went from lead to switch. It cannot be said as a matter of law, so it seems to me, that the helper was free of negligence in turning the switch so that the drag went onto number three; nor can it be said as a matter of law that the decedent stood on number three, with switch lights in sight, as to which there is no evidence, while the helper turned the drag directly upon him from a few feet away; nor do I understand that it is claimed that the case is within the rule that switchmen in customary yard movements must look out for themselves within T. St. L. & W. R. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. ed. 513, and cases cited; or Witort v. C. & N. W. Ry. Co. 178 Minn. 261, 226 N. W. 934, and cases of like effect cited there.