## EDWIN CROWLEY v. VIOLET JOY CROWLEY.[1]

March 2, 1945.

Nos. 33,865, 33,866.

*Eugene A. Rerat* and *Mart M. Monaghan,* for appellant.
*Horace Van Valkenburg,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Two actions between the parties here were consolidated for trial in district court. The first was one for a divorce instituted by

[1]Reported in 18 N. W. (2d) 40.

Edwin Crowley against Violet Joy Crowley on the ground of cruel and inhuman treatment. In this action defendant interposed a counterclaim seeking a divorce from plaintiff on the same ground. The district court made findings and ordered judgment for plaintiff, denying defendant both temporary and permanent alimony, but directing payment of her attorneys' fees and restoring her maiden name of Violet Joy. For convenience, this action is hereinafter referred to as the "divorce case."

In the second action, the same plaintiff sought judgment against the same defendant to the effect that certain conveyances which placed plaintiff's homestead in the names of both parties as joint tenants were obtained by defendant through fraud, and that defendant had no right, title, interest, or estate therein. In this action the court determined that defendant had no right, title, or interest in said premises and quieted title therein in plaintiff as against her. For convenience, this action is hereinafter referred to as the "homestead case."

Defendant appeals from both judgments, the appeals being consolidated here. In the divorce case, she contends that the evidence does not support the trial court's findings and conclusions that she was guilty of cruel and inhuman treatment toward plaintiff (1) in wilfully and wrongfully deserting him and concealing her whereabouts from him after wrongfully withdrawing $14,500 of his funds; (2) in interfering with his business and continually criticizing him in the conduct thereof; (3) in demanding a larger and more expensive home in which to live; (4) in nagging and finding fault with him when he was ill and unable to attend church services with her; and (5), by virtue of all the foregoing, in causing him to become nervous, upset, and ill, by reason of all of which he was entitled to an absolute divorce from defendant.

In the homestead case, defendant asserts that the evidence does not reasonably sustain the court's findings that the homestead was caused to be transferred by plaintiff to the parties as joint tenants, on account of the false and fraudulent representations of defendant that, if such transfer were made, she "would marry and live with

plaintiff for the rest of his life, and would care for him," and· to the effect that the agreement between the parties in this respect was breached by defendant on May 14, 1942, when she wrongfully deserted plaintiff, thereafter concealed herself from him, and failed to retransfer said property to him; and to the further effect that plaintiff is the absolute owner of said premises as against any right, title, or interest of defendant therein.

The facts are as follows: On April 4, 1942, plaintiff and defendant were married. At that time plaintiff was of the age of 65 years and defendant was 47. Plaintiff had previously been married for 36 years. His first wife died on August 14, 1936. There was no issue born of either marriage. Defendant, who had known plaintiff for some time prior to his first wife's death, called him shortly thereafter and asked him for employment as a bookkeeper in his ornamental iron and fence business in Minneapolis. She did not obtain such employment then, but thereafter during the six years prior to their marriage she and plaintiff saw each other at frequent intervals.

Plaintiff submitted substantial evidence which indicates that during this period defendant was concerned more about his property than she was about him. His witness, Mrs. Laura Fagley, with whom defendant then resided, testified to one occasion prior to the marriage when she accompanied defendant to plaintiff's office to solicit contributions for some organization, after which defendant stated to her:

"The man has more money than he knows what to do with, and I wish I might get some of it to build a rest home."

In November 1941, defendant was first employed by plaintiff as a bookkeeper. The agreement was made over the telephone at Mrs. Fagley's home. Thereafter, Mrs. Fagley testified, defendant said:

"Well, this is my lucky day, I am sure that I shall go over there into Mr. Crowley's employment. If I get in there right now I will get my fingers on things that I have been wanting now for a long time, because he might pass out and then I would be left out in

the cold world. But I should get in there right now because if I don't, it might be too late."

Ethel Singer, plaintiff's housekeeper, testified that defendant, shortly prior to the marriage, had said that:

"Mr. Crowley was sick and * * * needed someone who had had experience, in taking care of him, and if he had to go away for his health, which he frequently did, * * * if they were married, she could go with him, she could drive the car and she could take care of him."

In November 1941, one Gladys Harrison, a former employe of plaintiff, brought action against him to recover approximately $2,600 she claimed due her for overtime work. This suit was dismissed without settlement on October 1, 1942.

Prior to the marriage, plaintiff had on deposit in the Twin City Federal Savings & Loan Association of Minneapolis the sum of $7,000, and in the First Federal Savings & Loan Association of St. Paul the sum of $7,500. Defendant suggested that these accounts should be transferred from his name, as otherwise they might be subject to garnishment in the Harrison suit. Miss Singer related a conversation with defendant about this in March 1942, as follows:

"Well, Miss Joy said that that Harrison case, if there was a judgment rendered in that Harrison case, Mrs. Harrison is aware of those accounts and they could put a judgment—they could garnishee those accounts, and I think those accounts should be changed, and taken out of his name."

Plaintiff testified that for about two weeks prior to the marriage defendant had requested him to transfer the funds.

"She says Mrs. Harrison is—will be suing you, or has already sued you for back salary or something—I guess she had sued me, and she says, 'You better get that money transferred over to someone else's name right away because if they get on to this they may garnishee you and then you won't have the use of it.'"

He testified further that after the marriage her insistence in the matter continued.

"She says, 'You can just as well put that money into my name and then it will be safe. I don't want the money,' she says, · * * * 'Just as soon as your case is over with Harrison you can have it back.' "

At first he replied that he did not think the transfers were "really necessary for a while," but finally he agreed to them—he "was pretty sick at the time." On cross-examination he denied they were made to prevent Mrs. Harrison from getting any money out of her suit, but rather to prevent her from garnisheeing the accounts, pending the outcome of the action. Shortly thereafter Miss Singer testified to a further talk with defendant in which the latter said:

" 'We are going to have those accounts transferred this morning.' I had asked her previously to that, I said: 'Have you asked Mr. Crowley's attorney about this?' and she said: 'No, I don't think that is necessary because I know about those things, and we are going to have that attended to. * * * Those accounts are going to be transferred until the Harrison case is over with and then they will be put back in his name. I don't want his money, they will be put back in his name as soon as the Harrison case is taken care of.' "

On March 28, 1942, plaintiff, accompanied by defendant, directed officials of the First Federal Savings & Loan Association of St. Paul to transfer his account there to defendant. On March 30, 1942, again accompanied by defendant, he directed the officials of the Twin City Federal Savings & Loan Association to transfer his account there to defendant, making a total of $14,500 thus transferred to her on such occasions. About this time, defendant had a further conversation with Miss Singer in which she stated:

"I believe I will marry him, I will marry him and see him through the Harrison case, whether I will stay after that I don't

346

know, but I believe I will see him through that case. * * * If I did leave him I presume he would drink himself to death, but then that couldn't be helped."

Prior to the marriage of the parties, defendant repeatedly suggested to plaintiff the advantages of having plaintiff's homestead transferred to both their names as joint tenants. Plaintiff's testimony with reference to this included the following:

"Well, she [defendant] says, 'You are a sick man, * * * and you need a nurse. * * * I have had nurse training and I can take care of you and I can see that you get your medicine on time, and if we were married I would see that you got it.'

* * * * *

"Well, she said if the home was transferred into her name, transferred as joint tenants, then if I would happen to drop off it would go to her. I says, 'Well, that part is all right, * * * we will go down to Mr. Van Valkenburg's office tomorrow, * * * and we will see about getting it transferred.' * * * She said that if it was transferred to her that she was, that she had nurse's training and that she would see that I was taken care of * * * for the rest of my lifetime. * * * She said that we would go on down and see Mr. Van Valkenburg about getting the property transferred and then we would go on to Hudson and get married, or something to that effect."

Subsequently, on March 30, 1942, the parties went to the office of Mr. Horace Van Valkenburg, plaintiff's counsel, where, according to plaintiff, defendant—

"wanted to know if we could get the deeds drawed right up to date * * *. Then she wanted you [Van Valkenburg] to draw up a joint tenancy deed for my business property. * * * that I had agreed to transfer all my property to her. * * * She mentioned my farm at Sparta, Wisconsin."

Plaintiff further testified that he believed defendant when she told

him she would take care of him the rest of his life if he transferred his homestead as suggested.

At this time the deeds transferring the homestead to the parties as joint tenants were executed and delivered and subsequently recorded. With reference to his business property and the farm in Sparta, plaintiff stated that, because he did not have the descriptions, he could not transfer them at that time. Presumably for this reason and because of the objections interposed by Mr. Van Valkenburg, this additional property was not also then transferred.

Thereafter, on April 4, 1942, the parties were married at Hudson, Wisconsin. At all times subsequent thereto they had difficulty in getting along together. Defendant continued to work at plaintiff's office, and plaintiff insists that her work there disrupted his office force; that she interfered with his employes; changed his orders for work; disrupted his filing system; and otherwise made it difficult for him to conduct his business.

He further testified that she quarreled with him about his personal habits, particularly his habit of chewing tobacco. With reference to this, it is not disputed that plaintiff to some extent indulged himself in this respect. He used a crockery spittoon in the living room, a coffee can in the office, two cans by his bed, and one in the bathroom. He also carried a can spittoon in the car. In addition, he sometimes used as a spittoon a receptacle containing a large fern on display in the office. It is not disputed, however, that defendant, by virtue of her employment in the office and her visits to the home of plaintiff, as well as her other association with him, was well aware of this vice or virtue prior to her marriage to plaintiff.

With reference to plaintiff's drinking habits, of which defendant also complained, plaintiff insists that he used liquor only to a moderate extent prior to his marriage and gave it up completely thereafter at defendant's request. With reference to attending church services, on many occasions plaintiff accompanied defendant to her church, but on Mother's Day, when he had worked until

two o'clock in the morning, he refused to get up and attend services with her because of physical exhaustion. She shook him roughly to awaken him, argued with him violently about the matter, and finally left him in anger. Miss Singer, his housekeeper, testified that he had not indulged in liquor on this occasion, and in fact testified that during the entire five weeks subsequent to the marriage he had given up liquor completely.

On May 14, 1942, approximately six weeks after they were married, following a bitter quarrel, defendant left plaintiff. Thereafter plaintiff made repeated efforts to get in touch with defendant, writing her on occasion apologizing for any part he may have had in their quarrels and asking her to return. He was never able to find her or talk to her until the day of the trial. On May 22, 1942, she withdrew all funds transferred to her name in the First Federal Savings & Loan Association, and on May 31, 1942, she withdrew all funds transferred to her name in the Twin City Federal Savings & Loan Association, and has since retained all such sums in her possession. Title to the homestead remained in her name. In addition, she was the recipient of a $500 gift from plaintiff, which she applied upon the purchase of a new automobile, and of a diamond engagement ring and a wedding ring.

The evidence further discloses that defendant's attitude toward plaintiff while the parties were living together, her desertion and concealment, and her conversion of his savings left him in a nervous, ill, and exhausted condition. He was not well at the time of his marriage, and the domestic difficulties outlined, added to his other troubles, caused him sleepless nights and resulted in his losing weight and becoming nervous and despondent. As one witness stated:

"* * * he was * * * upset terribly. He would come to the office and he didn't seem to care about working there and he would come home again—he was very nervous."

The foregoing facts, covering only a portion of the testimony, convince us that there is ample evidence to sustain the find-

ings of the trial court and the conclusions based thereon. It is true, no evidence of physical cruelty was submitted, and it is evident that defendant's desertion was for an insufficient period to form the basis for a divorce on the grounds of desertion. However, under the view taken by this court that mental cruelty may form a sufficient basis for divorce, there is sufficient evidence here to sustain the finding and judgment in favor of plaintiff on this ground. As stated in Williams v. Williams, 101 Minn. 400, 112 N. W. 528:

"Cruel and inhuman treatment * * * consists of * * * such * * * equivalent and serious misconduct which, unjustified in fact, is so plainly subversive of the relationship of husband and wife as to make it impossible to discharge the duties of married life and to attain its objects, *and to be so hopelessly inimical to the health or the personal welfare of the injured party as to render continuance of the relationship intolerable."* (Italics supplied.)

See, also, O'Neil v. O'Neil, 148 Minn. 381, 182 N. W. 438; Tschida v. Tschida, 170 Minn. 235, 212 N. W. 193; Eller v. Eller, 182 Minn. 133, 233 N. W. 823; Locksted v. Locksted, 208 Minn. 551, 295 N. W. 402.

It is apparent that the conduct of defendant here was such as to render it impossible for the parties "to discharge the duties of married life and to attain its objects," and was such as to be "inimical to the health or the personal welfare" of plaintiff. He reposed great trust in defendant, as evidenced by the transfer of his homestead and his savings accounts totalling $14,500, because of her advice that by so doing he would avoid garnishment proceedings in a suit involving only $2,600.

In this connection it is to be noted that the transfers were made only after the repeated suggestions and insistence of defendant, and at a time when plaintiff was ill. There is no evidence that plaintiff made the transfers to avoid payment of any just indebtedness. Rather, the record indicates without dispute that plaintiff acquiesced in the transfers because of defendant's dominating in-

fluence and his belief in her statements that the accounts might be garnisheed prior to the final determination of the action. Plaintiff denied all liability in the action, and its subsequent dismissal without payment of any kind lends credence to his position in this respect. Under such circumstances, Mrs. Harrison could hardly be regarded as a creditor. In any event, after the transfers, plaintiff still retained title to his business and the real estate upon which it was located, valued in excess of $40,000—an amount far greater than the total sum claimed in the Harrison action. Defendant induced the transfers and promised that the funds would be returned to plaintiff immediately following disposition of the Harrison action, a promise later broken by her in every detail. She now seeks to retain the fruits of such acts by urging that the transfers were made to avoid creditors, and hence that the parties must be left where they placed themselves. Under the facts presented, we do not believe the transfers in question can be held to have been made to avoid or hinder creditors, nor do we find any legal principle lending support to this theory. Examination of the pleadings and the record further indicates that this question was neither litigated nor determined by the trial court, and hence would not appear to be before us here.

Obviously, defendant had no intention of giving plaintiff the care, love, and affection which might be expected of a wife and which she said would be his after their marriage if he would first make the transfers suggested. Her interference with his business; her constant faultfinding because of his personal habits and his failure to attend services with her; her desertion and concealment; her subsequent withdrawal of his savings; and his resulting illness, sleeplessness, and mental distress surely form sufficient basis to support the trial court's findings of cruel and inhuman treatment, inimical to plaintiff's health and personal welfare. While it may be true that each act considered separately might be insufficient to establish mental cruelty, when they are considered in conjunction with one another there can be little doubt of their effect upon plaintiff's mental and physical condition, and their

sufficiency to sustain the finding of cruelty in accordance with the statutory requirements as previously construed by this court.

■ With reference to the transfer of the homestead to the parties as joint tenants, it is again apparent that this was obtained by the false and fraudulent representations and statements made by defendant to plaintiff and because of the trust he reposed in her as his intended wife and the fiduciary relationship arising therefrom. As previously stated, plaintiff had been sick and ailing for a number of years. Defendant held herself out to him as a practical nurse, who would give him relief, care, and comfort in his ailments and care for and administer to him for the remainder of his life in the event they were married, and, of course, provided he first transferred his property as suggested. Upon this consideration and with this thought in mind, plaintiff did cause his property to be so transferred. That defendant had no intention of fulfilling her representations and promises at the time she made them is clear. Her statement: "I will marry him and see him through the Harrison case," indicates an intent directly contrary to that orally expressed by her both prior to and at the time of the transfer here involved. Under such circumstances, we cannot escape the conclusion that the transfer was obtained by fraud and misrepresentation and that, in consequence, a constructive trust resulted whereby she held title only for the benefit of plaintiff. As stated in Henderson v. Murray, 108 Minn. 76, 79, 121 N. W. 214, 216, 133 A. S. R. 412:

"* * * where a party obtains the legal title to land by fraud or bad faith, or by taking advantage of confidential or fiduciary relations, or in any other unconscientious manner, so that he cannot justly retain the property, equity will impress a constructive trust upon it in favor of the party who is equitably entitled to it. Such trusts for convenience are termed ex maleficio or ex delicto, and are practically without limit."

See, also, Penn Anthracite Min. Co. v. Clarkson Securities Co. 205 Minn. 517, 287 N. W. 15.

In Sieger v. Sieger, 162 Minn. 322, 202 N. W. 742, 42 A. L. R. 1, plaintiff, prior to his divorce, entrusted his wife with the purchase of certain real estate upon which they were living, in the belief that she would take title thereto in his name as grantee. She wrongfully procured a deed to herself and caused it to be recorded. In setting it aside, this court stated (162 Minn. 324, 202 N. W. 743) :

"The conduct of defendant as found by the court shows that she obtained the title to this property in bad faith *and in taking advantage of a fiduciary relation.* She did this in such an unconscientious manner that she should not in equity and good conscience be permitted to keep it. Under such circumstances equity will impress a constructive trust upon it in favor of the husband." (Italics supplied.)

Defendant cites Nelson v. Nelson, 149 Minn. 285, 183 N. W. 354; Gummison v. Johnson, 149 Minn. 329, 183 N. W. 515; Schmitz v. Wenzel, 166 Minn. 435, 208 N. W. 184; and Sparrow v. Sparrow, 172 Minn. 91, 214 N. W. 791, as authority for her contention that the subsequent desertion of a wife affords no ground for setting aside antenuptial agreements based upon the consideration of marriage. None of the cases cited involved the obtaining of property through fraudulent misrepresentations. In none of them does it appear as a fact that the marital promises were made without the intent of complete fulfillment by the party making them. In Gummison v. Johnson, 149 Minn. 329, 331, 183 N. W. 515, 516, in discussing defendant's contention that plaintiff had fraudulently obtained title to certain lands paid for by defendant, this court stated:

"The quoted allegations clearly admit that defendant was never ignorant of the fact that plaintiff held the title. The fraudulent representations relate merely to her opinion as to the legal status of the parties in respect to the farm. This hardly suffices as a legal ground for declaring a trust ex maleficio; at most, it was misrepresentation as to what the law was by one who, to defendant's knowledge, knew no more law than he did.

\* \* \* \* \*

"By section 6706, G. S. 1913, the absolute title vested in plaintiff, though the defendant paid for the farm, for it appears that the conveyance was made to her. Defendant's proposed answer does not place him in position to attack her title under section 6708, G. S. 1913, because, as stated, it discloses that he had knowledge of the fact that the title was in her and acquiesced therein, and it does not state facts showing that the title was so taken in her name in violation of any trust or through legal fraud."

In Sparrow v. Sparrow, 172 Minn. 91, 93, 214 N. W. 791, we stated:

"\* \* \* But where a wife of seven weeks deserts her husband without cause and then seeks in equity to compel the specific and continued performance of an antenuptial contract promising her an annuity out of her husband's estate, there is good ground for denying that relief. York v. Ferner, 59 Iowa 487, 13 N. W. 630."

In the instant case, the evidence discloses that defendant falsely promised plaintiff that she would live with him and care for him the rest of his life after their marriage if he would place title to the property in her name, and that at the time of making such promises she was already contemplating leaving him at the end of the Harrison case and after his property and cash were securely in her possession and control. Because of her expressed intention of ignoring her marriage vows and the obligations and responsibilities attached thereto, the conclusion cannot be escaped that the whole marriage contract was conceived in and based upon fraud on her part and that it at no time reached the dignity, sanctity, and permanence which the law contemplates the marriage contract should involve. For this reason and on this basis, this case is clearly distinguishable from the authorities relied upon by defendant, and the judgment appealed from must be affirmed.

Defendant applies for attorneys' fees and disbursements on this appeal. We concede that her counsel presented questions involving some doubt, and there can be no dispute that a substantial amount

of time and effort was required of him in the preparation of the record and his brief and in the presentation of his argument here. On the authority of Gerard v. Gerard, 216 Minn. 543, 13 N. W. (2d) 606, and Visneski v. Visneski, 219 Minn. 217, 17 N. W. (2d) 313, it is ordered that defendant be allowed and recover $100 for expenses on appeal and $150 as attorneys' fees, and that otherwise neither party recover any additional costs or disbursements here.

Affirmed.

PETERSON, JUSTICE (dissenting).

Neither the facts found nor the evidence are sufficient to warrant the granting of a divorce. Both marriage and divorce are regulated by statute, as a matter of public policy, to promote the integrity, sanctity, and permanency of the marriage relation as the very foundation of society. Other contracts and relations may be modified, discharged, and dissolved by agreement of the parties, but the marriage relation cannot. Once the relation is formed, the law steps in and holds the parties to the duties and liabilities arising from it. The law provides the grounds for divorce. Unless those grounds exist, a divorce cannot be granted, even though both parties to the marriage relation desire it and they might be just as well or better off if divorced. Because the grounds for divorce are purely statutory, the state is deemed to be a *quasi* party in every divorce action in the sense of making sure that no divorce shall be granted except for legal cause. See, In re Ellis' Estate, 55 Minn. 401, 56 N. W. 1056, 23 L. R. A. 287, 43 A. S. R. 514.

It seems clear that the judgments below, as well as their affirmance here, rest upon the proposition that the parties made an imprudent marriage, and that, because of that fact, the court ought to extricate plaintiff, not only from the marriage, but also from its consequences and those of his imprudent transfers of property to defendant prior thereto. It should be remembered that, after all, the situation in which the parties find themselves is of their own making. Neither of them was influenced to marry by the ordinary ideals connected with the nature and purposes of the marriage relation. Neither of them had any affection or esteem for the

other or a purpose to contribute to their common happiness. Defendant's prime purpose was to better herself financially. Plaintiff had no deep-seated feeling about the matter and got married, as the evidence shows, for no better reason than that he might just as well do so as not. They should have realized, if they did not, that at best their marriage was based upon convenience, indifference, and selfishness. That being true, their troubles were natural consequences of their conduct. However hard plaintiff's plight may be, he is not entitled to a divorce except upon legal grounds. We may feel a sympathy for him because he was old and foolish, but that is no reason for granting him a divorce. Old fools as well as young ones must bear the consequences of their own follies.

## THE DIVORCE CASE

1. A finding of cruelty is based upon the fact that defendant left plaintiff on May 14, 1942, and remained away from his home until the time of trial. The divorce action was commenced on June 30, 1942. After that date defendant had no right to return to plaintiff's home. Her absence therefrom was for a period of about one and one-half months prior to the commencement of the divorce action. Desertion is a specific ground for divorce, but only where it is wilful and continuous for one year next preceding the commencement of the action for divorce. Minn. St. 1941, § 518.06 (5), (Mason St. 1927, § 8585, subd. 5). While a divorce could not be granted here upon the ground of desertion, because of the fact that the alleged desertion had continued for but a fraction of the required statutory time before the commencement of the action, it is nevertheless made a ground for divorce in fact by holding that it is cruelty. This cannot be legally done. Each statutory ground for divorce is specific. Some grounds contain an element of cruelty, as, for example, adultery, drunkenness, and desertion. The fact that each is made a specific ground evinces a legislative intention that the ground asserted in a particular case must be established as such and that proof of one ground shall not be deemed to be proof of another. To permit one ground to be established by proof

of another would wipe out the statutory requirement of proof of specific grounds for divorce. It would do indirectly what cannot be done directly; it would permit a divorce to be granted for desertion as cruelty where it could not be done for desertion as such. Consequently, the cases hold that absence from home or unjustified desertion does not of itself constitute cruelty so as to entitle the deserted spouse to a divorce. Landry v. Regira, 188 La. 950, 178 So. 502; Wagner v. Wagner, 203 Mich. 328, 168 N. W. 1019; 17 Am. Jur., Divorce and Separation, § 83.

2. Cruelty is also predicated here upon the fact that defendant, as plaintiff's employe, interfered with the conduct of his business and countermanded certain orders which he had given to his employes. The parties stood in a dual relation, namely, that of employer and employe and that of husband and wife. When defendant was engaged in performing her duties at plaintiff's place of business she stood *ad hoc* in the relation of an employe to plaintiff. The acts complained of were committed by her as an employe and not as his wife. They did not constitute cruelty (1) because they did not concern the marriage relation in that they were done by her as an employe and not as his wife; and (2) because the evidence shows as a matter of law that they were not of a grave and serious character.

In considering whether these acts constitute cruelty as a ground for divorce, it is to be remembered, as we said in Pickett v. Pickett, 27 Minn. 299, 7 N. W. 144, that all the prescribed causes for divorce directly concern the marriage relation and consist of acts of misconduct constituting violations of the duties arising out of the marriage relation or neglect of or inability to perform its obligations. Since the acts in question were done by defendant as plaintiff's employe and not as his wife, they did not constitute a violation of any duty arising out of the marriage relation. They were simply breaches of duty by her as his employe. He had the right to discharge her as an employe, but not to divorce her as his wife, for violations of duty as his employe.

There are two well-recognized classes of misconduct constituting cruel and inhuman treatment: (1) Those involving actual or threatened physical violence of such a character as to endanger life, limb, or health or to create a reasonable apprehension of it; and (2) such *other equivalent* and *serious* misconduct which, unjustified in fact, is so plainly subversive of the relationship of husband and wife as to make it impossible to discharge the duties of married life and to attain its objects, and to be so hopelessly inimical to the health or the personal welfare of the injured party as to render continuance of the relationship intolerable. Williams v. Williams, 101 Minn. 400, 112 N. W. 528. We also said in the cited case (101 Minn. 405, 112 N. W. 530):

"* * * There is universal agreement on the part of all the authorities that the causes justifying divorce for cruelty must be *grave* and *weighty,* and such as show the absolute impossibility that the duties of married life can be discharged." (Italics supplied.)

See, Gellar v. Gellar, 159 Md. 236, 150 A. 717; 27 C. J. S., Divorce, § 25, note 99.

It is plain that the misconduct here in question was neither grave nor serious. Plaintiff did not regard the misconduct as serious enough to discharge defendant. That would have been a simple solution of his problem. If she, as an employe, interfered with the conduct of his business, he should have fired her and kept her at home, where she plainly belonged. It had never occurred to him to take any action in the matter until after she had cashed the drafts referred to in the opinion. Then to bolster his divorce case, he claimed that her acts constituted cruelty. In short, conduct which plaintiff did not deem sufficiently grave and serious to warrant discharging defendant from his employment is asserted by him, and held by the court, to be so grave and serious as to constitute a ground for divorce.

3. The fact that defendant requested plaintiff to purchase a larger and more expensive home is no ground for divorce. The evidence conclusively shows that the suggestion came from plain-

tiff's housekeeper and was concurred in by defendant. Defendant did not press the matter nor did she find any fault with him for continuing their residence in his old home. If such a request can constitute cruelty, every request by a wife to her husband to improve their living conditions would constitute a ground for divorce. This is utter absurdity.

4. The finding that defendant wrongfully nagged and found fault with plaintiff when he was unable to attend church with her is also plainly absurd. The facts are that the parties agreed Saturday evening to go to church together the following Sunday morning because it was Mother's Day; that Sunday morning plaintiff was sleeping on a couch in the living room apparently from drinking to excess as was his habit; that defendant shook and awakened him to inquire whether he was going to church with her; and that she told him that he could not lie there in that condition. It is not cruelty for a wife to rouse her husband from sleep apparently induced by his drunken and stuporous condition, or to protest against his making a nuisance of himself by sleeping in that condition in the living room of their home. Such conduct of the wife is a natural reaction to such misconduct of the husband. Nor is it cruelty for a wife to inquire of her husband whether he would keep his promise to accompany her to church. Such an inquiry is a reasonable one prompted by the wife's expectation of performance of the husband's promise. To hold that the acts in question constitute cruelty is to hold in effect that a wife must suffer in silence whatever indignities her husband may inflict upon her.

5. Two findings of cruelty are based upon the fact that defendant withdrew $14,500 from savings and loan associations by cashing drafts which plaintiff had given to defendant prior to their marriage. The drafts were given to her by plaintiff for the purpose of hindering and defrauding Mrs. Harrison from collecting a judgment, if she recovered one, in a pending suit against him. The understanding was that defendant would retransfer the drafts to plaintiff when the Harrison case was disposed of. It is clear from the testimony of both plaintiff and defendant that the purpose

was to hinder and prevent Mrs. Harrison from enforcing her claim by legal proceedings.[2] Mrs. Harrison brought an action to recover on her claim. Apparently the case was dismissed before trial. It does not appear that plaintiff was not in fact indebted to her. So far as appears, she was a creditor in fact, and the parties deemed her to be such. Where property is conveyed for the purpose of hindering and delaying creditors, the transferrer cannot maintain an action to set aside the transfer and to recover the property transferred. The law will leave the parties in the position in which they have placed themselves, refusing affirmative aid to either of them. Sawyer v. Harrison, 43 Minn. 297, 45 N. W. 434; Stevens v. McMillin, 37 Minn. 509, 35 N. W. 372; 3 Dunnell, Dig. & Supp.

[2]Plaintiff testified:

"Q. Would you tell us what conversation you had with reference to such transfer?

"A. Well, yes, she says if the money—she says if the money was transferred to her it couldn't be garnisheed—

"Mr. Carlson: I want to move to strike out the answer, your Honor, that every night when they got in bed she would razz him.

"The Court: It may be stricken out.

"Q. Going back to those conversations that you had with her before transferring the money, what else did she say, and what else did you say or what did she say?

"A. She says, 'You can just as well put that money into my name and then it will be safe. I don't want the money,' she says, 'I don't want the money,' she says. 'Just as soon as your case is over with Harrison you can have it back.'

"Q. Did you then turn over—I mean did you then transfer title to these two accounts into her name?

"A. Yes, I did."

Defendant testified:

"Q. Explain to the court the circumstances under which the savings accounts were transferred.

"A. Well, there were two reasons, the first was on account of the Harrison case, to protect him against garnishments or anything of that kind. Ethel and he and I had all talked about that and discussed it, what was best to do with everything, with the bank account. He had drawn them out and put it in a cashier's check so they couldn't garnishee the bank account. * * *"

§ 3899. As between the parties, defendant should be deemed the owner of the transferred funds regardless of plaintiff's prior rights or title. But that aside, to hold that the exercise of the wife's right to the transferred funds constitutes cruelty is to hold in effect that, while the wife cannot be compelled *directly* to retransfer the funds, she can be compelled *indirectly* by making the exercise of her right to the funds a ground for divorce. A wife is not guilty of cruelty for exercising her right not to transfer property, even though it may involve her husband in extreme hardship. Hofman v. Hofman, 40 Ind. App. 476, 82 N. E. 477.

The most that can be claimed from the acts in question is that they constitute violations of the unenforceable antenuptial arrangement between the parties that defendant would hold the drafts for plaintiff until the Harrison case had been disposed of. Even if it were conceded that defendant was guilty of misconduct in leaving plaintiff, she would not have forfeited her right to the drafts. In Sparrow v. Sparrow, 172 Minn. 91, 214 N. W. 791, we held that rights granted under an antenuptial arrangement are not forfeited by the wife's misconduct after the marriage.

Violation of an antenuptial agreement does not constitute cruelty as a ground for divorce. Wesley v. Wesley, 181 Ky. 135, 204 S. W. 165; Owen v. Owen, 90 Iowa 365, 57 N. W. 887. Both of the cited cases involved breaches of antenuptial contracts to transfer and convey property.

The foregoing discussion covers the various acts which are held to be cruelty and sufficient grounds for a divorce. In my judgment, none of them constitute cruelty.

### The Homestead Case

Plaintiff caused the title to his homestead to be conveyed to himself and defendant in joint tenancy. This was done prior to their marriage. Plaintiff's claim is that he and defendant agreed that after they were married they would continue to live together and that they would hold the property as joint tenants for their joint benefit. He claims that her agreement was fraudulent in that she

did not intend to perform it at the time it was made. The court found in accordance with plaintiff's version. In my judgment, the finding is not sustained by the evidence. The only evidence on the point is the testimony of plaintiff's housekeeper, who testified:

"A. Well, she said she believed—she said, 'I believe I will marry him, I will marry him and see him through the Harrison case, *whether I will stay after that I don't know,* but I believe I will see him through that case.'" (Italics supplied.)

In order to constitute fraud, the representation must relate to a past or existing fact and not to a future one. Fraud cannot be predicated upon an unperformed promise or statement of intention. In order to constitute a fraudulent representation, a promise for a future performance, afterward broken, must be made with the intention at the time of making it of not keeping it. Phelps v. Aurora State Bank, 186 Minn. 479, 243 N. W. 682; Maguire v. Maguire, 171 Minn. 492, 214 N. W. 666; 23 Am. Jur., Fraud and Deceit, §§ 38 and 106. Fraud can only be established by clear, positive, and convincing evidence. Sprague, Warner & Co. v. Kempe, 74 Minn. 465, 77 N. W. 412; 3 Dunnell, Dig. & Supp. § 3839. The evidence here does not evince a definite intention on the part of defendant at the time the arrangement was made not to perform the contract. The italicized portion of the evidence quoted plainly shows that defendant had not made up her mind at the time the contract was made not to perform it. She said that she *did not know* whether she would continue to live with plaintiff after the Harrison case or not. Viewing the evidence in the strongest possible light in favor of plaintiff, the statement was at best an equivocal one. Where the evidence is *equivocal,* an affirmative finding cannot be sustained. Sprague, Warner & Co. v. Kempe, *supra.* In determining whether defendant had no intention to perform the agreement at the time it was made, the court has no right to reject, as it clearly does, the italicized part of the housekeeper's testimony. It is this part of her testimony which is decisive here, because it *affirmatively* shows

362

that defendant had not at that time formed a fixed intention not to perform—at least it left the matter in equivocation.

I think that there should be reversals in both cases.