CALMER BORSGARD, ADMINISTRATOR c.t.a. OF
ESTATE OF SARAH ELVERUM, AND OTHERS
v. OLE P. ELVERUM AND OTHERS.

80 N. W. (2d) 604.

January 4, 1957—No. 36,969.

*Nicholas & Muir* and *F. B. Kalash,* for appellants.
*Grottum & Winzenburg,* for respondents.

KNUTSON, JUDGE.

Ludwig P. Elverum and Sarah Elverum were married in 1909. They lived together until the death of Sarah. They had no children. At the time of their marriage, Ludwig owned a 200-acre farm in Christiana Township, Jackson County, which has been referred to throughout the record, and will be referred to herein, as the Christiana farm. In 1927 they acquired another farm of 160 acres in Delafield Township in the same county, similarly referred to as the Delafield farm. This farm was purchased from one Stoesz. It was paid for by conveying to Stoesz a tract of land in North Dakota owned by Sarah and valued at $2,500 and a piece of land in Murray County owned by Ludwig and valued at $3,000; by assuming the balance of two mortgages; and by paying the rest of the purchase price in cash. Title to this farm was taken in the name of Sarah. Eventually all mortgages were paid and the two farms were owned clear of encumbrances, one in the name of Ludwig and the other in the name of Sarah. On October 24, 1944, Ludwig and Sarah went to a bank in Windom and, by use of a third-party conduit, conveyed both farms to themselves as joint tenants. The two joint-tenancy deeds then were placed in Ludwig's safety deposit box. They were not recorded. After the execution of these deeds, the parties continued as before to treat the Christiana farm as the property of Ludwig and the Delafield farm as that of Sarah. Sarah insured the buildings on the Delafield farm in her individual name and referred to it as her farm.

During the latter part of October 1951, Sarah became ill and went to a hospital in Windom. On November 1, Attorney O. J. Finstad, who had known both Ludwig and Sarah for many years, was asked

by Ludwig to go to the hospital because Sarah wanted to make a will. When he arrived, Sarah informed him that she wanted to make a will and she handed him a memo which she had made about a year before providing for some bequests in favor of her sisters and the children of a deceased brother and sisters. Finstad testified:

"* * * she handed me that paper and said that that was a paper she had made the year before, and she said she and Ludvig had talked it over and she wanted to make a will substantially like that except there were a few changes."

Finstad was told what changes she wanted to make, and he returned to his office, where he drafted a will in accordance with the instructions he had received. He then returned to the hospital, and the will was properly executed. Ludwig was present during all the time that Finstad was with Sarah. The case hinges largely on the testimony of Finstad as to what transpired during the making of the will. The pertinent portion of his testimony is as follows:

"Q. Now, at that time, Mr. Finstad, was anything said about any property belonging to Mrs. Elverum?

"A. Mrs. Elverum said that the farm in Delafield Township was her farm, and that she wanted these payments to be made out of that farm, or proceeds from it.

\* \* \* \* \*

"Q. Yes. Now, what if anything did Mr. Ludvig Elverum say in regard to this will?

"A. Well, we talked it over together, these payments to the sisters and relatives. He said that that was all right, and then these other payments, other legacies that came in were added, and he said that was all right. Then after they were ready, when they were all through with the legacies, then I told her and told Ludvig that a will would have to give at least one-third of the property of the testator to the husband and she said—Ludvig said that was all right, there would be enough left, or more than enough for his one-third out of that farm, out of her farm.

"Q. Did Ludvig indicate by words or actions or anything that he consented to this disposition by Mrs. Elverum?

"A. Yes, we talked everything over, and he consented to it all, and she said, 'I trust you to do this—take care of this, as I want you to be the executor in the will,' and he said he would act as executor, and he would take care of this will.

* * * * *

"Q. Now, did Ludvig say anything at that time about certain deeds which evidently had been signed by the parties some time prior?

"A. He did not.

* * * * *

"Q. So far as you know, Mr. Finstad, the property was in the name of—at that time the property was in the name of Mrs. Elverum?

"A. It was in her name at the time I made the will, on record.

"Q. On record. And nothing was said by any of the parties to contradict that situation.

"A. No, she referred to her farm several times, and Ludvig didn't object to it or make any explanation."

With respect to what happened at the time the will was executed, Finstad testified:

"Q. And what happened?

"A. Well, read the will over; Ludvig was present, and she said that was all right and didn't find any changes. I said if it was any changes to be made she could still make them.

"Q. Did she ask Ludvig if it was all right?

"A. Well, he said it was all right. I don't remember just all the conversation, but it was talked over and everything—"

The day after the will was executed Ludwig had the joint-tenancy deeds recorded. Sarah died on November 13, 1951. After her death, Finstad spoke to Ludwig a number of times about carrying out the provisions of Sarah's will. He was told that there was no need of probating the will because the farms were placed in joint tenancy to save the expense of probating and that he would take care of the legacies provided in Sarah's will.

Ludwig died intestate on September 9, 1953, without having paid the bequests in Sarah's will. His sole heir at law was a brother, Ole P. Elverum, who lived in California. At that time none of the legatees in Sarah's will knew that she had made a will. Upon Ludwig's death, Calmer Borsgard, who is a son of Sarah Elverum's sister and one of the legatees named in Sarah's will, called Ole Elverum and informed him of Ludwig's death. He was told that Ole could not come to the funeral but that he (Calmer) should take care of matters with respect to the estate. A short time after Ludwig's death, Calmer procured authority from the probate court to open Ludwig's safety deposit box. The will of Sarah was then discovered. Thereafter, Calmer Borsgard, at the request of Ole Elverum, withdrew from the administration proceedings in the Ludwig Elverum estate and Edwin H. Dahl was appointed administrator. The final decree was entered on September 14, 1954, assigning all the property of Ludwig to Ole P. Elverum, including the Delafield farm.

On May 8, 1954, prior to the entry of the final decree, Ole P. Elverum sold the Delafield farm on a contract for deed to Ervin Benson for a consideration of $28,000. Of this amount, $5,000 was paid at the time of the execution of the contract and the balance was to be paid on or before March 1, 1955. The contract contains the following provisions among others:

"Said Abstract shall be furnished and shall show good title in first party as of March 1st, 1955. In case the probating of the estate of Ludwig P. Elverum shall not then be completed and a Final Decree entered therein, first party shall have a reasonable time after the entry of the Decree in said estate to furnish said Abstract.

\* \* \* \* \*

"If for any reason first party is unable to furnish an Abstract of Title showing a good and merchantable title to said premises \* \* \*, then first party shall return to second party said $5,000.00 paid on the purchase price, together with interest thereon at 5% per annum until paid."

On July 31, 1954, Ole P. Elverum and his wife executed a warranty deed to John Ward Hosking, Jr., and Jean S. Hosking, as joint tenants, covering the Delafield farm and other land in consideration for a contract to support them and other consideration. Jean Hosking is a daughter of Ole Elverum's wife; John is Jean's husband. On October 18, 1953, John Hosking wrote a letter to Calmer Borsgard in which he said, among other things:

"Allow me to introduce myself. My wife Jean (Silliman) is Mrs. Ole Elverum's daughter. We take care of Ole's correspondence inasmuch as he can write only with extreme difficulty, due to lack of control of his right hand. Otherwise, he enjoys comparatively good health.

\* \* \* \* \*

"Mr. Borsgard, in writing to you, I want you to understand that we are merely taking care of Ole's correspondence at his request, and all decisions are up to him."

Originally, an action was brought by some of the legatees under the will of Sarah Elverum, as plaintiffs, against the administrator of the Ludwig Elverum estate and Ole Elverum, as defendants, seeking to have the joint-tenancy deeds, under which the Delafield farm was conveyed to Sarah and Ludwig Elverum as joint tenants, set aside. Summons and complaint in that action were served personally on the administrator of the estate of Ludwig Elverum on July 2, 1954, prior to the execution of the deed by Ole P. Elverum and wife to John Ward Hosking, Jr., and Jean S. Hosking. Ervin Benson was permitted to intervene in that action. That action was dismissed on September 13, 1954, by the trial court on the ground that plaintiffs did not have capacity to sue for the reason that they were not heirs at law of Sarah Elverum nor had her will been admitted to probate at the time of the commencement of the action.

The present action was commenced on September 27, 1954. Personal service was made on Ervin Benson, and service by publication was made upon all the other defendants who were nonresidents of Minnesota. The complaint in this suit sets forth two causes of action, one seeking to have the joint-tenancy deeds set aside, and

the other seeking to have a constructive trust impressed upon the Delafield farm for the benefit of the legatees under the will of Sarah Elverum. At the close of plaintiff's case, the court dismissed the first cause of action but, after the trial, made findings in favor of plaintiffs on the second cause of action. This appeal is from an order denying defendants' motion to dismiss the second cause of action or, in the alternative, for amended findings of fact and conclusions of law or a new trial.

Two questions are presented for our consideration: (1) Did plaintiffs have capacity to sue? (2) Does the evidence sustain the court's decision impressing a constructive trust upon the farm?

■ Defendants contend that plaintiffs lack capacity to maintain this action. It is their contention that the right to disaffirm the joint-tenancy deeds rested in Sarah Elverum alone and that, because she failed to disaffirm during her lifetime, her heirs or legatees under her will cannot do so after her death. For the most part they rely on Zartner v. Holzhauer, 204 Wis. 18, 234 N. W. 508, 76 A. L. R. 396. The facts in that case clearly are distinguishable from those in the case now before us. That case was brought by a residuary legatee under the will of Emma Zartner to recover damages for deceit and fraud allegedly practiced upon decedent in procuring the conveyance of certain real estate. The court held that, inasmuch as decedent had not rescinded the conveyance during her lifetime, the legatee could not do so after her death. The case did not involve the imposition of a constructive trust upon land. Even if the facts could be held to be similar, the part of the opinion relied upon by defendants has now been repudiated by the Wisconsin court in the later case of Glojek v. Glojek, 254 Wis. 109, 35 N. W. (2d) 203. The great weight of authority is contrary to the Zartner case.[1] Inferentially at least, we have applied the majority rule. Barrett v. Thielen, 140 Minn. 266, 167 N. W. 1030, 168 N. W. 126. The action here is not an action to set aside the conveyance but an action in equity to impress a constructive trust upon the land. We think that it is clear

---

[1]Annotation, 2 A. L. R. 431; 9 Am. Jur., Cancelation of Instruments, § 10; 1 C. J. S., Abatement and Revival, § 134; 12 C. J. S., Cancellation of Instruments, § 45.

that such action may be maintained by those heirs at law or beneficiaries under a will for whose benefit such trust exists.

While defendants assign numerous errors as grounds for relief, their case rests largely on the sufficiency of the evidence to sustain the court's finding which is the basis for the establishment of a constructive trust. Defendants contend that we should disregard the testimony of Attorney Finstad. The trial court was convinced, as stated in its memorandum, "that the testimony of O. J. Finstad speaks the truth." All that we need say is that the credibility of the witnesses is for the trial court to determine. Finstad's testimony is not so inherently improbable that we should say as a matter of law that it is unworthy of belief. As a matter of fact, all the circumstantial evidence supports it.

Part of defendants' argument rests upon an apparent failure to recognize the true nature of a constructive trust. Thus, argument that parol evidence is inadmissible to invalidate the joint-tenancy deed is ineffective[2] for the reason that establishment of a constructive trust does not contemplate the setting aside of the deeds. To the contrary, it proceeds on the theory that, even though the legal title rests in the grantee of the deed, equity will declare that such title is held in trust for someone else to whom it rightfully belongs. If the deeds were to be set aside, there would be no need for a constructive trust for then the title would be in Mrs. Elverum and the probate of her will would take care of the payment of the bequests involved here. The true nature of a constructive trust is adequately set forth in Knox v. Knox, 222 Minn. 477, 481, 25 N. W. (2d) 225, 228, where we said:

"* * * It [a constructive trust] is an unjust-enrichment, rectifying remedy and has nothing in common with an express trust except a confusing similarity in surname or label. In order to arise, fraud, in its true sense, need not even be present. * * * It should be noted that it is not even necessary that a fiduciary relation should exist. 25 Minn. L. Rev. 667, 689. It is not the product of the intent of the parties. The nature of a constructive trust can best be comprehended

---

[2]See, 25 Minn. L. Rev. 667, 716.

by keeping clearly in mind that it is not, in its true sense, a trust at all, but purely a creation of equity designed to provide a remedy for the prevention of unjust enrichment where a person holding property is under a duty to convey it to another to whom it justly belongs. * * * A court of equity, in decreeing a constructive trust, is bound by no unyielding formula, but is free to effect justice according to the equities peculiar to each transaction wherever a failure to perform a duty to convey would result in unjust enrichment."

In Restatement, Restitution, § 160, the rule is stated as follows:

"Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises."

In Henderson v. Murray, 108 Minn. 76, 79, 121 N. W. 214, 216, 133 A. S. R. 412, 415, we said:

"* * * where a party obtains the legal title to land by fraud or bad faith, or by taking advantage of confidential or fiduciary relations, or in any other unconscientious manner, so that he cannot justly retain the property, equity will impress a constructive trust upon it in favor of the party who is equitably entitled to it."

In this case, a confidential and fiduciary relationship existed between Ludwig and Sarah Elverum at the time the will was executed and at the time that Ludwig agreed to the provisions thereof and to see that they were carried out.[3] While the execution of the deeds was not procured by any fraud, the evidence establishes that the parties, after the execution of the deeds, continued to consider the respective farms as their individual property. At the time of the execution of the will, Mrs. Elverum referred to the Delafield farm as her farm. The evidence will sustain a finding that it was understood between the parties that the bequests made by her in her will were to be paid out of this farm. The evidence also adequately sustains a finding that, at that time, Ludwig not only agreed to the

[3]Martin v. Tucker, 217 Minn. 104, 14 N. W. (2d) 105; Crowley v. Crowley, 219 Minn. 341, 18 N. W. (2d) 40; see, 25 Minn. L. Rev. 688.

provisions of the will but acted in such a manner as to make Sarah believe that he would carry out the provisions of the will. If he had not done so, she could have taken other action to the end that the bequests could be paid out of her interest in the farm. We think that the case clearly establishes plaintiffs' rights to equitable relief.[4]

This case has been tried, and the trial court's findings are based, on the theory that a constructive trust exists in favor of plaintiffs. As a matter of fact, what we are dealing with is more probably an equitable lien.[5]

Restatement, Restitution, § 161, reads as follows:

"Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises."

In *comment b* of this section we find the following:

"* * * Where the equitable lien is upon other property [not money] the court will ordinarily decree that unless the holder of the property pays the amount of the lien the property be sold and out of the proceeds the amount of the lien be paid."

Here it would seem that plaintiffs are not entitled to a conveyance of the Delafield farm to them but, rather, are entitled to have the legacies bequeathed to them in the will of Sarah Elverum paid out of the farm. Apparently the trial court had that disposition of the matter in mind for paragraph 4 of its conclusions of law reads as follows:

"The Court reserves jurisdiction herein to appoint a trustee to carry out the constructive trust, upon proper application made therefor."

This question was not raised in the briefs of either party here, and we mention it only for the reason that the final disposition of the case should be made in such a manner as to carry out the provisions of the will—not to convey the property to plaintiffs. A constructive

---

[4]Cf. Matheson v. Gullickson, 222 Minn. 369, 24 N. W. (2d) 704, 31 Minn. L. Rev. 496.

[5]For a distinction between the two, see 25 Minn. L. Rev. 667, 688.

trust rests upon the same equitable foundation as an equitable lien, but the final disposition of the case will vary depending upon whether we are dealing with one or the other. We have discussed the case on the assumption that we are dealing with a constructive trust only because the case has been tried on that theory. The result would necessarily be the same up to this point, but it may be important in the final disposition of the case to have the distinction between the two in mind.

■ Finally, defendants claim that Jean S. Hosking and John Ward Hosking, Jr., as well as Ervin Benson, are innocent purchasers for value and therefore unaffected by any constructive trust existing in favor of the legatees under the will of Sarah Elverum by virtue of M. S. A. 501.10, which reads:

"No implied or resulting trust[6] shall be alleged or established to defeat or prejudice the title of a purchaser for a valuable consideration, and without notice of such trust."

We have no difficulty in holding that the evidence amply sustains the court's findings that Mr. and Mrs. Hosking had notice of the claims of plaintiffs. Jean Hosking was a daughter of Mrs. Ole Elverum. John looked after some of Ole's affairs and, as early as October 18, 1953, wrote a letter to Calmer Borsgard in which he said:

"* * * We take care of Ole's correspondence inasmuch as he can write only with extreme difficulty, due to lack of control of his right hand."

On November 13, 1953, Ole Elverum, after having petitioned the probate court to appoint Calmer Borsgard as administrator of Ludwig's estate, petitioned the court for the appointment of someone else, stating in part in the petition:

"* * * That since the filing of said Petition, your petitioner has been informed that the legatees under the Last Will and Testament

---

[6]We are not dealing here with a resulting trust. For a distinction between constructive trust and resulting trust, see Restatement, Restitution, § 160, *comment b.*

of Sarah Elverum, deceased, intend to file a claim against the estate of said Ludwig P. Elverum in the approximate amount of $9,500.00, and that the said Calmer Borsgard is one of the legatees under the Last Will and Testament of said Sarah Elverum, and that he, therefore, is adversely interested against the estate of the said Ludwig P. Elverum, and therefore, unqualified to act as Administrator of the estate of said Ludwig P. Elverum."

The relationship between Mr. and Mrs. Hosking and Ole Elverum appears to have been very close. Consideration for the deed under which this farm and other land was conveyed to them is based at least in part on a contract to support Ole Elverum and his wife. The deed to the Hoskings was not executed until July 31, 1954. Under these circumstances, it would be hard to believe that the Hoskings did not have the same knowledge of plaintiffs' claim when this deed was executed and delivered to them that Ole Elverum had.

There is more difficulty in finding support for the finding that Ervin Benson was not an innocent purchaser for value, but, here too, we believe that the evidence is sufficient to sustain the court's finding. The contract for deed is dated May 8, 1954. It was recorded on July 2, 1954, the same day on which the first action was commenced herein. It is drawn on a standard printed statutory form No. 54, contract for deed. Inserted therein by typewriter we find the following two clauses:

"Said Abstract shall be furnished and shall show good title in first party as of March 1st, 1955. In case the probating of the estate of Ludwig P. Elverum shall not then be completed and a Final Decree entered therein, first party shall have a reasonable time after the entry of the Decree in said estate to furnish said Abstract.

\*   \*   \*   \*   \*

"If for any reason first party is unable to furnish an Abstract of Title showing a good and merchantable title to said premises, then first party shall return to second party said $5,000.00 paid on the purchase price, together with interest thereon at 5% per annum until paid."

The insertion of these clauses in typewritten form indicated some doubt as to the seller's ability to furnish clear title. It should have put the buyer on guard if he did not already know of the claim of plaintiffs. While the evidence to sustain this finding is not strong, we believe that it is sufficient. In any event, in the enforcement of the equitable rights of plaintiffs so as to secure payment of the bequests provided under the will of Sarah Elverum, the rights of Benson may be adequately protected. Even if Benson were to be held an innocent purchaser for value, the unpaid balance of the purchase price is more than enough to secure payment of the legacies without interference with the rights of Benson under his contract.[7]

Affirmed.

[7]See, Third Nat. Bank v. Stillwater Gas Co. 36 Minn. 75, 30 N. W. 440; Restatement, Restitution, § 166, *comment f*, and § 202; 25 Minn. L. Rev. 667, 713.