# ROY CHARD, SPECIAL ADMINISTRATOR OF ESTATE OF ELLIOTT B. VARNER, v. MARSHALL B. DARLINGTON AND OTHERS.[1]

January 28, 1955.

No. 36,412.

---

[1]Reported in 68 N. W. (2d) 405.

*R. J. Leonard* and *Doherty, Rumble & Butler,* for appellants.
*Theodore Arlander,* for appellant William H. Darlington.
*M. J. Daly,* for respondent.

KNUTSON, JUSTICE.

Elliott B. Varner, who had been a lifetime resident of the area of Jordan, Minnesota, died on September 17, 1950. He left surviving him two sisters, Rowena V. Darlington, who was then 90 years of age and who died in January 1951, and Hannah V. Scott, 86 years of age; a brother, Harold C. Varner, 66 years of age; and the following children of deceased brothers and sisters: Ethel Chard, Lulu Burling, Beatrice Chard Wolfram, Roy Chard, Stella Chard Wolfram, and Edith C. Haag, who were children of Lulia Chard, a deceased sister; Lloyd W. Odenwald, Ralph B. Odenwald, John B. Odenwald, Lee E. Odenwald, Marjorie Odenwald McCauley, and Dorothy Odenwald Joslyn, who were children of Ada Odenwald, a deceased sister; William A. Varner and Ruth Varner Hart, who were children of William A. Varner, a deceased brother; and Harlan E. Varner, child of Leo Varner, a deceased brother.

Marshall B. Darlington is the son of Rowena V. Darlington, as is William H. Darlington. William went to work in Minneapolis. Marshall stayed at home and ran the farm occupied by his invalided mother. The farm was across the road from the farm owned and occupied by Elliott. Elliott's farmhouse was about a quarter of a mile from the Darlington residence. Marshall is a man in his early fifties and is single. Elliott was a bachelor and had lived alone on his farm since about 1926.

It is undisputed that, during his lifetime and up to a few days prior to his death, Elliott B. Varner was the owner of some treasury bonds which are involved in this action. He kept these bonds, his cash, and other personal property in a metal box in the basement of his home.

In June 1943, Elliott, who then was about 75 years of age, became ill and entered a hospital, where he remained until August of that

year. Before he left for the hospital he showed Marshall where he kept his bonds and money. Marshall was given the key to the box, and while Elliott was in the hospital he would have Marshall procure money from the box and send it to him so that he could pay his hospital bill. After leaving the hospital, Elliott spent three months at the Darlington home, and when he had recovered sufficiently, he returned to his own home. In 1946 or 1947 Elliott again became ill and returned to the Darlington home. About this time he transferred his bonds and currency, which he kept in a package, to the Darlington home. In the spring of 1949, Elliott entered St. Mary's Hospital in Minneapolis. He requested Marshall to bring him some of his cash, and this money was used by the wife of William Darlington to pay Elliott's hospital bills. After leaving the hospital, Elliott went to William's home, where he remained for about two months, and then returned to the Rowena Darlington home where Marshall lived. He remained there until he died.

It is the claim of defendants that, prior to his death, Elliott made a gift of negotiable bonds, having a face value of $40,000, to certain of his relatives, defendants herein. Marshall testified that a short time before Elliott's death the bonds were taken from a dresser drawer in his room where they were kept and placed on a card table before Elliott, together with some envelopes; that Elliott then took bonds having a value of $12,500 and placed them in an envelope and laid it down; and that Marshall then wrote on it the name of the person to whom it was to go and from whom. The same procedure was followed as to the other bonds allegedly given to the other defendants. The bonds in these envelopes were then placed in the same dresser drawer from which they had been taken, and they remained there until after Elliott's death.

It is undisputed that about two o'clock in the morning of September 17, 1950, Elliott fell dead from a cardiac decompensation or heart failure. Marshall called Harold C. Varner and William Darlington, and they arrived at his home a few hours later. Marshall then took the envelopes containing the bonds, and the testimony of Harold Varner is that he handed him an envelope containing $6,000

in bonds and said to him: "Harold, Elliott wanted me to do this, and I want to do it right now." According to his brother William, Marshall then turned over to him an envelope containing $6,000 in bonds and stated: "Elliott wanted it that way." At the same time he said in the presence of others: "In this envelope, now, there is Twelve Thousand Five Hundred ($12,500.00) Dollars, [referring to his own] * * * and in this envelope there is Twelve Thousand Five Hundred ($12,500.00) Dollars for mother, Rowena Darlington." At the same time he showed William Darlington an envelope for Jane Breimhorst. Jane acknowledged that the bonds were delivered to her on the day of Elliott's death or very shortly thereafter.

Ada Scott, a daughter of Hannah Scott who was a sister of Elliott, is employed by the Prudential Insurance Company and is a resident of Minnesota. Her mother, who is past 85 years of age, lives in Gilby, North Dakota. Ada Scott testified that during the month of October 1949 she and her mother visited with Elliott while he was in St. Mary's Hospital in Minneapolis and that her mother then said to him: "I think you should make a will," and that he answered: "I don't need to make a will; I have everything taken care of," and that he said: "I am going to let the farm go into my estate, but the bonds are not going into the estate," and that "Marshy [who is Marshall Darlington] has the bonds and knows what to do with them." Ada then stated that she said to Elliott: "Don't they have to be assigned to somebody?" and that he answered: "No, they were the kind of bonds which belong to whoever has them," and that she said: "I didn't know there were any bonds like that," and he said "Marshy has them." She testified further that he said: "I don't want the Chards to have any of the bonds," and that he said: "Marshy has the bonds and he knows what to do with them."

Ellen Darlington, wife of William, attempted to testify to a conversation which she said took place between Elliott and herself sometime during the period when he stayed at their home. The objection to this testimony was sustained, and an offer of proof was then made to show that Elliott had told her that he had made arrangements for the distribution of the bonds and that Marshall had received instruc-

tions as to how they were to be distributed upon his death. The trial court sustained plaintiff's objection to this testimony on the ground that Ellen had a "pecuniary interest" in the outcome of the lawsuit.

Elliott Varner left no will. Marshall Darlington was appointed administrator of his estate in October 1950. Thereafter he reported to his attorney the alleged transfer of these bonds and to whom they had been transferred. An inheritance tax report was then made showing the transfer of these bonds to the various recipients as follows: Rowena Darlington, his sister, $12,500; Harold Varner, a brother, $6,000; Marshall Darlington, a nephew, $12,500; William Darlington, a nephew, $6,000; and Jane Varner Breimhorst, a niece, $3,000.

In addition to these bonds, the estate, according to the inventory, consisted of the homestead appraised at $6,000; cash in the amount of $3,000; and treasury bonds registered in the name of the deceased valued at $4,700.

Plaintiff was appointed special administrator on August 11, 1953, and this action was brought originally for the recovery of the bonds or the value thereof. At the commencement of the trial plaintiff was permitted to amend his complaint so as to sue for twice the value of the bonds on the ground that they had been converted.

The trial court instructed the jury, in effect, that, if they failed to find that decedent had made a gift of the bonds, they must return a verdict against all defendants for $80,000. The jury so found. This appeal is from an order denying defendants' motion for judgment notwithstanding the verdict or a new trial.

While there are a number of assignments of error, the questions presented for our determination here are:

(1) On whom does the burden of proof rest in a case of this kind?

(2) Is M. S. A. 525.392 applicable, and, if so, is good faith on the part of defendants a defense to the action for double liability?

(3) Was the testimony of Ellen Darlington admissible under § 595.04?

(4) Were the envelopes in which the bonds allegedly were placed admissible in evidence?

■ The trial court's instruction on the burden of proof is far from clear. The court instructed the jury:

"In the instant case the burden is upon the plaintiff to prove by a fair preponderance of the evidence that there was a conversion of the Treasury Bonds involved in this action and that said conversion was made on the part of the defendant named in the action and that the burden remains with the plaintiff throughout the trial.

"On the other hand, the burden of proof rests upon the defendant to prove that there was an actual gift of the United States Treasury Bonds involved in this particular action to the defendant Marshall B. Darlington for the purpose testified to on his part; and therefore, before the defendants can recover a verdict in this case they must prove to you by clear and convincing evidence that the deceased did make a valid gift to them of the Treasury Bonds and that at the time he intended to vest the title of these bonds in the defendants without reserving any right on his part to reclaim the property at any time in the future. If the defendants have failed to prove by clear and convincing evidence that the deceased intended to make a valid gift to them of his bonds that ends the case and your verdict would be for the plaintiff, if the plaintiff has proved his case by a fair preponderance of the evidence; but if, on the other hand, the defendants have proved to you by clear and convincing evidence that the deceased Elliot B. Varner did intend to and did, in fact, make a valid gift by and through Marshall B. Darlington of the Treasury Bonds, then the defendants are entitled to a verdict against the plaintiff as special Administrator of the estate of Elliot B. Varner."

It is difficult to see how a jury could apply this instruction. The applicable rule is that, when plaintiff had established that the bonds were the property of decedent immediately or shortly prior to his death, that made out a prima facie case of ownership, and the burden then rested on defendants to establish a gift. While the answer is simply a general denial, the defense consists of defendants' claim

that decedent made a gift *inter vivos* and the proof of that defense rests on the one who asserts it.[2]

■ Section 525.392 reads as follows:

"If any person embezzles, alienates, or converts to his own use any of the personal estate of a decedent or ward before the appointment of a representative, such person shall be liable for double the value of the property so embezzled, alienated, or converted."

It is the contention of defendants that good faith is a defense to imposition of double liability. Prior to the adoption of our revised probate code by L. 1935, c. 72, our statute read as follows (Mason St. 1927, § 8806):

"If any person, before the granting of letters testamentary or of administration, embezzles or alienates any of the personal estate of a decedent, such person shall be liable, in an action by the executor or administrator for the benefit of such estate, for double the value of the property so embezzled or alienated."

It had remained substantially as it was in the 1927 statute since territorial days. R. S. 1851, c. 55, § 10.[3]

Under statutes such as ours prior to 1935, the great weight of authority is that good faith is a defense to imposition of double

[2]Gale v. Gale, 70 Vt. 540, 41 A. 969; Denver & Salt Lake Ry. Co. v. Equipment Co. 87 Colo. 169, 285 P. 941; Mosteller v. Holborn, 20 S. D. 545, 108 N. W. 13; Lang v. Harwood (Tex. Civ. App.) 145 S. W. (2d) 945; see, also, Derby v. Gallup, 5 Minn. 85 (119); Amick v. Exchange State Bank, 164 Minn. 136, 204 N. W. 639.

[3]While the question has not been raised here and we do not determine it, it should be noted that the words "in an action by the executor or administrator for the benefit of such estate" found in the statute prior to the 1935 amendment were eliminated. In Owens v. Owens, 207 Minn. 489, 498, 292 N. W. 89, 94, we said:

"The apparent purpose of the statute is to give to *those persons subsequently declared the legal owners of a decedent's estate* a remedy against persons attempting to deprive them of their heritage * * *." (Italics supplied.)

liability.[4] Some of the decisions are based on a determination that such statutes are penal in nature, and others have come to this conclusion by the application of the principles of executor *de son tort.*[5]

In Owens v. Owens, 207 Minn. 489, 499, 292 N. W. 89, 94, we held, in determining whether the statute of limitations applied, that § 525.392 is not penal, "since it gives the same right as existed at common law and merely increases the damages payable to the party aggrieved."

It is not easy to determine from the decisions what are penal statutes.[6] Sometimes it is said that statutes are both remedial and penal.[7] Strictly speaking, a penal statute is one which is intended to enforce obedience to the mandates of the law by punishing those who disobey it.[8]

However, we think that it is not essential to reconsider whether the statute is penal or not. Decision in this case can be placed on a determination of the legislative purpose in enacting the statute.

Under statutes such as ours prior to 1935, many courts have held that, before the double liability can be exacted, it must appear that the property was wrongfully alienated or embezzled. The word "embezzles" denotes a wrongful appropriation of the property, so in statutes limited to embezzling or alienating the difficulty lies only with the proper interpretation of the word "alienates." In Jahns v.

---

[4]Larson v. Quanrud, Brink & Reibold, 78 N. D. 70, 47 N. W. (2d) 743, 29 A. L. R. (2d) 230; Regional Agricultural Credit Corp. v. Chapman (9 Cir.) 129 F. (2d) 435; Delfelder v. Poston, 42 Wyo. 176, 293 P. 354; Jackson v. Lamar, 67 Wash. 385, 121 P. 857; Batchelder v. Tenney, 27 Vt. 578; Roys v. Roys, 13 Vt. 543; see, Beckman v. McKay, 14 Cal. 251; but cf. Jahns v. Nolting, 29 Cal. 508; Merrill v. Comstock, 154 Wis. 434, 143 N. W. 313; see, also, Annotation, 29 A. L. R. (2d) 252; 36 Minn. L. Rev. 277.

[5]We have abolished by statute the action against a person as executor *de son tort.* M. S. A. 573.04.

[6]See, Sedgwick, Construction of Statutory and Constitutional Law (2 ed.) p. 333; 3 Sutherland, Statutory Construction (3 ed.) §§ 5602 and 5603.

[7]3 Sutherland, Statutory Construction (3 ed.) § 5703.

[8]3 Sutherland, Statutory Construction (3 ed.) § 5602; Huntington v. Attrill, 146 U. S. 657, 13 S. Ct. 224, 36 L. ed. 1123.

Nolting, 29 Cal. 508, 512, the California court said, in connection with a statute similar to ours prior to 1935: .

"To embezzle, as the term is employed in section one hundred and sixteen, is to fraudulently appropriate to one's own use, or conceal the effects of the estate which such person has in his possession; and to alienate, signifies to wrongfully transfer such property to another. Such embezzlement or alienation is a wrongful conversion of the property, for which an action of trover was maintainable at common law."

In Nicholas & Shepard Co. v. Dunnington, 118 Okl. 231, 233, 247 P. 353, 355, the Oklahoma court said with respect to a similar statute:

"* * * The term 'alienate,' as used in section 1220, C. O. S. 1921, signifies the wrongful transfer of such property to another."

The general rule is stated in 33 C. J. S., Executors and Administrators, § 170, as follows:

"One who embezzles, alienates, *or converts* to his own use the property of decedent before the appointment of an executor or administrator is liable for double the value of the property under a statute expressly so providing, but some bad faith or wrongful conduct on the part of defendant is necessary to subject him to such penalty, and the term 'alienate' as used in the statute signifies a wrongful transfer to another." (Italics supplied.)

While the cases cited in support of this text involve statutes similar to ours prior to 1935, the text apparently includes the word "converts" in the same category as embezzle or alienate insofar as good faith as a defense is concerned.

The case of Springer v. Jenkins, 47 Ore. 502, 84 P. 479, dealt with a statute very similar to our present statute.[9] In deciding that good faith was a defense, the Oregon court said (47 Ore. 508, 84 P. 481):

---

[9]"If any person shall, before administration is granted, embezzle, alien, or in any way convert to his own use any of the property of a deceased person, he is liable to the executor or administrator in double the amount of damages which may be assessed therefor."

"* * * we are of the opinion that Section 1152 does not apply to a case where the defendant acted in good faith under color of legal right, supposing he had title to the property or a right to enforce a lien thereon, though he should subsequently be unable to establish such title or right. The statute is highly penal in its consequences, and was evidently intended to punish those who might wrongfully or in bad faith interfere with, convert to their own use, or dispose of the property of a deceased person, by mulcting them in double damages; and its language should, we think, be so construed. To subject a defendant to the penalty given by the statute, it should appear that he was an intermeddler, and acted from wrong motives or in bad faith; otherwise, the executor or administrator should be satisfied with the ordinary remedies given him by law: * * * They [the defendants] may have been ill advised, or may have mistaken their rights; but, until it is made to appear that they acted from wrongful motives or in bad faith, the plaintiff is not entitled to recover double damages from them."

In our case of Owens v. Owens, 207 Minn. 489, 498, 292 N. W. 89, 94, we stated with respect to the purpose of the statute:

"The apparent purpose of the statute is to give to those persons subsequently declared the legal owners of a decedent's estate a remedy against persons attempting to deprive them of their heritage and to double the damages recoverable because of the likelihood that the wrongdoer can in such cases successfully conceal his malfeasance."

It would seem to us that the evident purpose of the statute is to subject to double liability anyone who wrongfully interferes with or appropriates property belonging to a decedent before a representative is appointed who lawfully can take possession of it. The double liability is intended to deter anyone from so interfering with such property. Where there is an honest belief that the property belongs to the one charged with the conversion of it or where he honestly believes that he has a right to possession of it, he should not be subjected to double liability merely because he is unable ulti-

mately to establish such ownership or right of possession. Cases do arise in which there is a genuine question of ownership. The establishment of a gift often involves complicated legal questions, the determination of which may necessitate the opinion of a court of last resort before it finally is settled.[10] A party who believes that he is the owner of property should not be subjected to double liability merely because he asserts his right and happens to lose in the end, if he acts in good faith.

In this case, as far as the record shows, with the exception of Marshall Darlington, all that the defendants did was to accept an envelope with their names on it, enclosing the bonds in various amounts, which they were told was given to them by decedent. As to them, there is no other evidence of embezzlement, alienation, or conversion. There is neither allegation nor proof of any conspiracy or joint action on the part of the defendants to convert the whole of the property involved. It must have been a rude awakening for those defendants who received from $3,000 to $6,000 worth of bonds to learn, after litigation, that they were subjected to a judgment not only for double the amount of the bonds they had received but for $80,000, double the total amount of all the bonds involved. We believe that no legislature could have intended such an unjust result. At the very most, under the evidence in this case, the liability of the defendants who did nothing more than accept the bonds given to them could not exceed double the value of the property which they converted even if it were found that they acted in bad faith, and there is no evidence of that in this case.

■ The testimony of Ellen Darlington, wife of William Darlington who was one of the recipients of bonds, was excluded on the theory apparently that she and her husband had a joint bank account. There was no showing that any of the bonds received by William would ever reach Ellen. It was error to exclude that testimony. We have held on a number of occasions that a spouse is not incompetent, under § 595.04, to testify in an action involving personal property where it is not shown that she has any interest in the outcome of the

---

[10]Cf. Connell v. Bauer, 240 Minn. 280, 61 N. W. (2d) 177.

litigation.[11] In In re Estate of Arnt, 237 Minn. 245, 248, 54 N. W. (2d) 333, 336, we recently stated the principles which will disqualify a person from testifying under this statute. We there said:

"To render a person incompetent as a witness under § 595.04, he must have some legal, certain, and immediate interest in the event of the action with respect to the issue to which his testimony relates. The interest must be pecuniary, certain, direct, and immediate, and not an uncertain, contingent, remote, or merely possible interest."

The opposite holding is to be found in cases involving the recovery or ownership of real estate in which the spouse has an inchoate interest.[12]

■ Marshall B. Darlington testified that, on the occasion in September 1950 when the gift was consummated, he brought the package containing the bonds to decedent and placed them on a card table in front of him, together with some envelopes; that decedent then took various amounts of bonds and placed them in the envelopes; and that he, Marshall, wrote on each envelope for whom it was and from whom. When the envelopes were offered in evidence, objection was sustained on the ground that "it is an attempt to evade the dead-man's act and introduce inferences or results of conversations with a deceased person."

Our statute (§ 595.04) does not forbid testimony of acts of the decedent.[13] In Chadwick v. Cornish, 26 Minn. 28, 31, 1 N. W. 55, 57, we said:

"* * * The language of the act, 'any conversation with, or admission of,' refers, strictly, only to spoken words. * * * it does not

[11]See, Johnson v. Whitney, 217 Minn. 468, 14 N. W. (2d) 765; Anderson v. Anderson, 197 Minn. 252, 266 N. W. 841; In re Estate of Mollan, 181 Minn. 217, 232 N. W. 1.

[12]See, Cocker v. Cocker, 215 Minn. 565, 10 N. W. (2d) 734. For a general annotation on the subject of the admissibility of the testimony of a spouse in an action in which the other spouse is interested in personalty, see Annotation, 27 A. L. R. (2d) 538.

[13]Chadwick v. Cornish, 26 Minn. 28, 1 N. W. 55; Larson v. Lund, 109 Minn. 372, 123 N. W. 1070.

exclude testimony of the acts of the deceased * * * although they may in law have the same effect as oral admissions."

That case has been followed in many subsequent cases.

We have held that letters of a decedent are admissible.[14] We likewise have held that oral proof of the contents of lost letters is admissible.[15]

If decedent himself had written on the envelopes the names of those who were to receive the bonds, clearly they would be admissible as an act of his. Where Marshall wrote on the envelopes in the presence of the deceased, the decedent placing the bonds in such envelopes, it is no less an act that may be shown. The credibility of the testimony, of course, was for the jury, but we think that the envelopes clearly were admissible and that it was error to exclude them.

Reversed and new trial granted.

[14]Newton v. Newton, 46 Minn. 33, 48 N. W. 450.
[15]In re Estate of Berdell, 143 Minn. 328, 173 N. W. 665.