JOHN J. BRENNAN, ADMINISTRATOR OF ESTATE OF
EARL E. BRENNAN, v. EVELYN B. CARROLL.

111 N. W. (2d) 229.

August 18, 1961—No. 38,225.

*Eugene A. O'Brien* and *John J. Doherty,* for appellant.
*Joseph Robbie,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendant's motion for amended findings or for a new trial.

Plaintiff is the administrator of the estate of Earl E. Brennan who died on December 14, 1958, at the Veterans Administration Hospital in Minneapolis. Decedent left no wife or children but was survived by the plaintiff, who was his brother, and several sisters, including de-

fendant, Evelyn B. Carroll, wife of Lynn B. Carroll,[1] Cecil Mc-Whinney, Phyllis Paul, and Bernice Kunz, as well as nieces and nephews.

Prior to 1956 decedent had been employed for a number of years at the Minneapolis Post Office, from which employment he retired on pension because of disability. It appears from the record that in December 1956 he learned that he had a throat cancer as the result of visits as an outpatient to the University of Minnesota Hospitals. On December 25, 1956, he was a guest at the home of Mr. and Mrs. Carroll. At that time it was suggested that he enter the Veterans Administration Hospital, which he did on December 28, 1956. He remained there until his death except for certain intervals. Plaintiff testified that on November 12, 1958, and for some time prior thereto, Earl was unable to talk but communicated by writing notes on a pad.

One of the basic questions in this case is whether there was a gift of certain stocks and money in a savings account from decedent to defendant. As part of his evidence to show that there was not, plaintiff produced exhibits A, B, C, and D.[2] Defendant submitted exhibit 1.[3]

---

[1] Lynn B. Carroll was originally named as a defendant but the court granted his motion to dismiss the action as to him when it appeared that he had no property in which plaintiff claimed an interest on behalf of the estate.

[2] Exhibit A reads as follows: "Nov. 12—1958. John, you figure out the exact amt. Evelyn; if we need money we will use all my my account & pensions as the come in. If more is necessary you and John arranged to get it from stock. You, will then distribed among the 5 brothers & sisters and the 10 nieces and nephews, evenly the balance. All division will be made in your name. But now—you and John find out the best way to do it. Please make it easy for me. *Take over!* Earl."

Exhibit B, according to plaintiff's testimony, was prepared by him on September 24, 1958, at the office of Piper, Jaffray & Hopwood, brokers. It reads as follows: "200 Libbey, McNeil and Libbey—72.51; 200 Mpls. Gas Co.—29.6; 110 Mt. Fuel Supply Company; 20 Red Owl Stores—46.5; (85) Are these the present prices? 12/31/56 Libbey, McNeil, Libbey—." Plaintiff testified that the words, "Are these the present prices?" appearing on the exhibit were written by Earl at the hospital on September 28, 1958.

Exhibit C, prepared by Lynn B. Carroll in October 1957 but never signed by Earl, reads as follows: "To Evelyn Brennan Carroll: This is a

Other evidence submitted by defendant relating to the intent and retention of control of the property is the testimony of Lynn B. Carroll who testified as follows:

"Q. Now, when did you first become aware that Earl Brennan had transferred some property, or did you ever become aware that Earl Brennan transferred some property to your wife?

"A. Yes. That was a few days following Christmas, 1956.

"Q. You became aware of that fact?

---

memorandum of a gift of $3,000 which I gave you October 7, 1957, and which confirms the other free gift I gave you of the stock which I transferred to your name. I have wanted you to have these gifts for yourself alone, as you are the one beloved by me above all my other sisters and brothers. I make this memorandum so that if anything happens to me, there shall be no question as to the validity of these gifts to you and it is proof of my free, sound and sincere wishes that you shall be the sole owner of said gifts."

David Lincoln McWhinney, the husband of Cecil, testified that on October 14, 1958, he visited Earl at the hospital and showed him exhibit C. Plaintiff's exhibit D, he said, was then prepared in his presence by Earl. It reads as follows: "Cecil has been good about writing. You know I think I enjoy it as much as a visit. She explained about visiting a long time ago. You tell Cecil I had nothing to do with it. Lynn came bouncing in this hospital about six or eight months ago and handed me that. I just put it with the rest and intended to destroy it. They are his words. Read aloud. Cecil has been fine. Now, about Dr. Gamble or anyone. I can pay the fee, just so I don't get in bad here. There is no preference, Cecil. Linc can see how hard it is for me to write."

[3]Defendant's exhibit 1 is a document prepared by David Lincoln McWhinney purporting to be Earl's will. According to McWhinney's testimony it was prepared at plaintiff's request after he showed McWhinney exhibit A. It was prepared sometime in November 1958 but never was signed by Earl. It reads in part as follows:

"First. I order and direct that all my just debts and funeral expenses be first paid out of any property of my estate by law subject to the payment thereof.

"Second. I give, devise and bequeeth to my five (5) brothers and sisters and my ten nieces and nephews, all equal distribution of the remainder of my estate consisting of stocks, bonds and cash including that held in trust by my sister Evelyn Carroll."

"A.   That's right.

"Q.   And how did you become aware of it?

"A.   Because he came out and told her that he had—I was home at the time. He told her that he had transferred his stock to her, that he wanted her to have it because there had been some disagreeable things happened after the mother's death, and he didn't want that to happen again.

\*     \*     \*     \*     \*

"Q.   What did he say to you?

"A.   Well, he said, 'I have given—I am going to give it to her,' and then he told Evelyn that she would get a letter from Piper, Jaffray in a few days.

"Q.   What did he say when you told him that he should put something in writing? I am not sure that you answered that specifically, Mr. Carroll.

"A.   Well, he just said that he was going to give it to her and there wouldn't be any argument about it.

\*     \*     \*     \*     \*

"Q.   Did you ask him a question?

"A.   Yes. He could talk then.

"Q.   Yes. What did you ask him? What did you say to him?

"A.   I didn't ask him a question. I said—he mentioned the fact that, well, the association of the family, and he went over a rather unpleasant event that he had with one of his sisters where the door had been slammed in his face, and he was—he was quite hurt over that. And then I told him, I said, 'Earl, when and if you pass out,' I said, 'you are going to have an argument or there is going to be a question of that gift,' and he said, 'I haven't got anything. How can they question it?'

\*     \*     \*     \*     \*

"Q.   Do you remember any specific conversations you had with him during that period of time pertaining to the stock or the assets that he had transferred to your wife?

"A.   Well, I had—I continued to urge him to make some written

acknowledgment of it and his attitude was, 'Well, I haven't anything; it's hers.' "

Brace Bennitt, associated with Piper, Jaffray & Hopwood, brokers, testified that he had acted as broker when certain stocks were purchased through his firm by Earl Brennan; that Earl purchased 200 shares of Minneapolis Gas Company common stock in April 1953, 100 shares of Mountain Fuel Supply Company in September 1953, 75 shares of American Water Works preferred stock in October 1953, 85 shares of Western Casualty & Surety Company common stock in January 1954, and 200 shares of Libby, McNeil & Libby common stock in December 1956. The American Water Works and Western Casualty stocks were sold in 1954 and 1956 respectively. The witness said that on December 28, 1956, there was a transfer of the remaining stock to Evelyn B. Carroll and that at the time of the trial (January 1960) the account was not in the name of Earl E. Brennan but in the name of the defendant. On December 28, 1956, according to the witness, Brennan brought the securities to him and said that he wished to have them transferred to his sister's account and on the reverse side of the certificates had so designated in his endorsement. Bennitt said that the certificates were delivered to the cashier in the broker's office for transfer and Earl was given a receipt for them. When the securities came back from transfer shortly after the first of the year in 1957 Bennitt checked with defendant to ascertain whether she wished them mailed to her or held in the brokerage office in "safe-keeping custodianship." He said that defendant told him to hold them. The stocks were held in a custodial account for defendant by Piper, Jaffray & Hopwood and were still there at the time of the trial.

Mr. William A. Riek, auditor for the Marquette National Bank, testified that decedent opened a savings account in that bank on April 10, 1958; that the account was made in the name of Earl E. Brennan or Evelyn Carroll; that subsequent to that date and prior to Earl's death, additions and withdrawals were made to and from the account but that no withdrawals were made by Evelyn and all additions were made by Earl; that on April 9, 1959, after plaintiff's death, the account was closed by the withdrawal of the balance of $982.18 by the defendant, Evelyn B. Carroll.

Evelyn B. Carroll testified that she did not have possession of the joint bank account savings book until approximately July 1958. Plaintiff argues that this testimony is contradictory to her previous answers to interrogatories submitted by him. He contends that Evelyn never exercised any control or use of any kind of the joint bank account until her only and final withdrawal of funds on April 9, 1959.

The legal issue raised on appeal is whether the property in the hands of the defendant should be subject to a constructive trust for the benefit of the plaintiff as administrator of decedent's estate.

It is the contention of the plaintiff that defendant has not sustained her burden of proof that the property herein was a gift to her.

The trial court found among other things:

(1) During December 1956 Earl made a number of outpatient visits to the University Hospitals and made tentative arrangements for an operation; during those visits he represented that he was unable to pay the expenses of an operation and it was suggested to him that he arrange to be admitted as a county patient; at that time Earl was able to pay for such operative expenses as he was then the owner of stock worth about $10,000 and money in excess of $3,000 and was also receiving certain pension checks at regular intervals.

(2) On December 28, 1956, Earl entered the Veterans Administration Hospital for care and treatment and remained there until his death except for a period of about a month in February and March 1957, a period of 6 months between April and October 1957, and a period of about 3½ months between April and July 1958.

(3) On December 28, 1956, Earl took the stocks he owned to Piper, Jaffray & Hopwood where he saw Brace Bennitt, who had previously acted as his broker; that he advised Bennitt that he wished to have the stocks transferred to the account of defendant as he had designated by his endorsement; there was no conversation with Bennitt with reference to the purpose of his making the transfer and he did not express his intent in transferring the stock nor did he instruct Bennitt to deliver the certificates to the defendant. Subsequent to December 28, 1956, neither Piper, Jaffray & Hopwood nor Bennitt re-

ceived any further instructions or request from Earl regarding the stocks; the stocks were never physically delivered to defendant and the certificates are still in the possession of Piper, Jaffray & Hopwood, and since December 28, 1956, certain dividends earned by the stocks have been used for the purchase of additional stock in the name of Evelyn B. Carroll.

(4) Prior to April 10, 1958, Earl E. Brennan had a savings account with the Marquette National Bank and on that date he transferred the account to a joint account with defendant with right of survivorship; subsequent to April 10, and prior to his death, additions and withdrawals were made to and from the account but no withdrawals were made by defendant and all of the additions were of Earl's money; and on April 9, 1959, the defendant closed the account by withdrawing the balance of $982.18.

(5) On or prior to October 10, 1957, Lynn Carroll prepared exhibit C and on that date and on several subsequent occasions he presented the exhibit to Earl and requested him to sign it but Earl failed and refused to do so and it was not signed at the time of the latter's death.

(6) After Earl entered the hospital on the last occasion exhibit C and two carbon copies were found in his apartment by plaintiff, who discussed its provisions with his sister, Cecil McWhinney, and her husband, David Lincoln McWhinney; during the last month of his lifetime Earl was unable to talk and during that period he would write out answers to questions asked of him and give written questions, instructions, or requests to persons with whom he had contact.

(7) On September 12, 1958, Earl was handed plaintiff's exhibit B which contained a list and prices of stocks previously referred to and on it he wrote, "Are these the present prices?"

(8) On October 14, 1958, Mr. McWhinney visited Earl at the hospital and showed him a copy of plaintiff's exhibit C and in response to this and other subjects discussed, Earl wrote the words contained on plaintiff's exhibit D.

(9) On November 12, 1958, Earl signed and then delivered exhibit A to the plaintiff; after receiving said exhibit from Earl, plaintiff discussed it with Mr. and Mrs. McWhinney; and thereafter Mr. Mc-

Whinney prepared defendant's exhibit 1, a purported will which was later presented to Earl but was never signed or executed.

(10) The funeral bill of Earl remains unpaid but there are enough assets in the estate to care for this and other claims against the estate.

In its conclusions of law the court stated: (a) That the decedent did not make a gift to defendant of the corporate stocks and the money in the savings account; (b) that defendant Evelyn holds the proceeds of said savings account and the stocks as a constructive trustee for the benefit of Earl's estate; (c) that the plaintiff did not establish his right of recovery under Minn. St. 525.391 pertaining to property fraudulently conveyed; and (d) that the defendant should pay and deliver to the plaintiff as administrator for the benefit of Earl's estate the sum of $982.18 representing the proceeds of the savings account and endorse and deliver to said plaintiff for the use and benefit of said estate the corporate stocks involved.

Defendant asserts that the trial court erred (a) in concluding that she had failed to sustain her burden of proof that the property referred to herein was a gift to her and that, therefore, a constructive trust resulted for the benefit of the plaintiff; (b) in finding that the corporate stock was not delivered to her; and (c) in admitting plaintiff's exhibits A, B, C, and D.

She argues on appeal that all the necessary attributes of a valid and complete gift are reflected by the evidence in this case.

The general essentials of a gift are stated in 8 Dunnell, Dig. (3 ed.) § 4020, as follows:

"* * * The legal elements of a gift are (1) delivery, (2) intention to make a gift on the part of the donor, and (3) absolute disposition by him of the thing which he intends to give to another."

Defendant contends that when Earl delivered the stock certificates to the broker, and directed the transfer thereof to her, a completed gift had been accomplished. She claims this was especially so when the broker subsequently inquired of her as to the physical disposition of the gift and she directed that the certificates should remain in the possession of the broker in a custodial account in her name. It is her contention that all of this can be deduced from the testimony of the

only impartial witness, Bennitt; that there was no evidence from Bennitt or any other witness that at the time of the delivery Earl expressed any intent other than to transfer title in the certificates to her; and that subsequent actions of Bennitt reflect his execution of that intent.

With respect to the joint bank account, defendant argues that the court's conclusion is incomprehensible when it is realized that there is a presumption in her favor as donee of that gift, citing Dyste v. Farmers & Mechanics Savings Bank, 179 Minn. 430, 229 N. W. 865. In that case the court stated that the statute providing that a deposit in the name of two or more may be paid to the survivor or to the personal representative of such survivor creates a presumption that the fund belongs to the survivor.

Defendant further contends that the evidence is uncontradicted that at the time Earl made the gifts of the stocks and the joint bank account, complete and unqualified gifts were accomplished in accordance with the requisites of the law pertaining to gifts; that there is a presumption in her favor that the transfer of the joint bank account was a gift; and that the plaintiff had the burden of proving a constructive trust. She also claims that there is no evidence in this case that at the time Earl made the gifts to her and prior thereto that he made or intended anything other than an absolute disposition of the gifts. She contends that plaintiff's exhibits A, B, C, and D are all evidence of declarations of Earl made subsequent to the gifts and are therefore inadmissible.

It will serve no useful purpose to go into further discussion of the contrary claims of plaintiff and defendant except to say in summary that it is plaintiff's position that the circumstances in this case, viewed in their entirety, indicate that the property held by the defendant is held in trust for the heirs of decedent. To the contrary defendant argues that no stretch of the imagination is sufficient, on the basis of the record and exhibits here, to permit a judicial determination that a constructive trust should be imposed.

With reference to the stocks, the trial court stated in its memorandum, made a part of its findings, that there was not sufficient delivery to meet statutory and case law requirements and that the weight of the evidence supported plaintiff's claim that there was neither the

intention on the part of Earl to make a gift nor an absolute disposition of it by him.

In considering defendant's objections to the reception of plaintiff's exhibits A, B, and D, it was the trial court's opinion that they should be admitted over defendant's objections that the dead man's statute precluded their reception. It cited as authority Chard v. Darlington, 243 Minn. 489, 500, 68 N. W. (2d) 405, 412, wherein this court said:

"Our statute (§ 595.04) does not forbid testimony of acts of the decedent."

See, also, Chadwick v. Cornish, 26 Minn. 28, 1 N. W. 55.

It was the court's position that exhibit A was not a part of a conversation and D was admissible because Mr. McWhinney was not a party in interest.

In connection with the hearsay rule with reference to those exhibits, the court further stated:

"Defendant did not object to the reception of Plaintiff's Exhibits A, B or D at the time of trial on the ground of hearsay. That objection appeared first in the memorandum filed by defendant after trial. However, the case was tried to the Court, the exhibits were received with reservations * * *."

An examination of the exhibits satisfies us that inasmuch as the case was tried by the court without a jury, and the exhibits were received with reservations, there was no reversible error under the facts and circumstances here.

We come now to the principal question on appeal and that is whether or not under the record here the evidence justified the trial court's conclusions of law that Earl Brennan did not make a gift of the corporate stocks and moneys in the savings account to the defendant and that she holds the stocks and the proceeds of the savings account as a constructive trustee for the benefit of his estate.

With reference to the stocks, the Uniform Stock Transfer Act provides in Minn. St. 302.02:

"Title to a certificate and to the shares represented thereby can be transferred only:

"(1) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of shares represented thereby * * *."

In In re Declaration of Trust by Bush, 249 Minn. 36, 81 N. W. (2d) 615, 82 N. W. (2d) 221, this court held that a transfer of stock on the books of a corporation was not sufficient to transfer legal title where the alleged donor kept possession of the stock certificate.

We quoted there with approval from 1A Bogert, Trusts and Trustees, § 142, p. 13:

"The mere direction by the owner to the corporation to change the corporate records regarding ownership, followed by such change to the name of another, would seem to be inadequate proof of a gift, when not followed by delivery of the new certificate. The change of the corporation transfer books is not ordinarily necessary to a completed gift or conclusive evidence that a donation has occurred."

In that case we adopted the rule that a bare transfer of stock on the books of a corporation and the issuance of a new certificate in the name of another as transferee, all at the request of the original stockholder, does not of itself pass the legal and equitable title to the stock to the transferee where the transferor takes and retains possession of the new certificate and does not in any manner make a delivery thereof to the transferee.

The Bush case differs from the case at bar in that the stockholder there turned in his certificate of stock and had a new one issued and recorded on the corporate books in the name of another as transferee but when this was done he had the new certificate delivered into his own hands and retained possession of it until the death of the recorded transferee.

In the instant case, as stated by the trial court in its memorandum:

"Here the problem is somewhat different because Earl Brennan did not, after December 28, 1956, keep physical possession of the stock. It is noted, however, that he did not give instructions for its delivery to Evelyn Carroll and that there was no expression of an in-

tent except that of having the certificates issued in her name. It is also noted that during the lifetime of Earl, Mrs. Carroll took no steps to secure physical delivery of the certificates to her and, indeed, so far as it appears from the testimony, she has made no such an attempt to this date. It seems very doubtful that the requirements of delivery under Minnesota law have been complied with either as our law applies to gifts or as it applies to the transfer of stock. Of course, it was not necessary for Earl to have delivered the certificates in person. He could have asked Mr. Bennitt to deliver them or he could have instructed Mr. Bennitt to hold them for Mrs. Carroll. But he did neither, and even absent other facts in the case which indicate a contrary intent on his part, it does not seem that there was such a delivery of the stock as the law contemplates."

It might be argued, however, that when Earl came to the Carroll home a few days after Christmas in 1956 and told Evelyn, according to Lynn Carroll's testimony, he had transferred the stocks to her and wanted her to have them, that was sufficient to complete the gift. It is observed, however, that this conversation did not supply the necessary legal requirements under the record here to constitute a gift of the stocks from Earl.

In fact, Mr. Carroll, an attorney himself, must have had some doubt in his own mind as to whether Earl had complied with all of the requirements necessary to make a gift of the stocks inasmuch as his testimony indicates that on different occasions he told Earl, in connection with the matter, that he should put something in writing.

In the record is also plaintiff's exhibit C prepared sometime in October 1957 by Mr. Carroll purporting to be an unsigned memorandum from Earl to his sister Evelyn. That exhibit would indicate, for whatever it is worth, that some 10 months after Earl was supposed to have made the gift of the stocks to Evelyn on December 28, 1956, there was still some doubt in her husband's mind that Earl had given Mrs. Carroll the stocks.

To offset the claim that Earl gave the stocks to Evelyn, we have plaintiff's exhibit A dated November 12, 1958, written by Earl about a month before he died. It stated in part:

"* * * if we need money we will use all my my account & pensions as the come in. If more is necessary you and John arranged to get it from stock."

Regarding the stocks, it is our opinion that there was evidence sufficient to justify the court's conclusions that Earl Brennan did not make a gift of them to Evelyn so as to comply with the legal requirements as to delivery, intention to make a gift, and absolute disposition by him.

Referring to the savings account, the court said in its memorandum that the defendant had established as sufficient a delivery as the circumstances would permit; that she also established a prima facie case and is entitled to the benefit of a presumption from this showing that there was a gift, citing Minn. St. 48.30, and Dyste v. Farmers & Mechanics Savings Bank, 179 Minn. 430, 229 N. W. 865. The memorandum further stated, however:

"* * * But a rebuttable presumption disappears when there is evidence opposing it. 'It ceases or is out of the case upon the introduction of evidence opposing it.'[4] Dunnell's Digest, Evidence, Sec. 3430, and cases cited. Here, defendant's case rests entirely upon the presumption. Mrs. Carroll did not contribute anything to the account, she did not use the account for her own purposes until after decedent's death, and except for the presumption created by our statute and our case law there is no evidence to support her claim of a gift. While the question is not entirely free from doubt, it is concluded that plaintiff's evidence discussed above is sufficient to overcome the presumption, and that the essentials of a gift of the savings account have not been established."

We hold that with reference to the savings account there was evidence to support the court's determination that Earl Brennan did not make a gift of that money to the defendant.

Affirmed.

---

[4]The exact language in 7 Dunnell, Dig. (3 ed.) § 3430, is as follows: "It ceases or is out of the case upon the introduction of substantial proof to the contrary."

Otis, Justice (dissenting).

■ The plaintiff, John J. Brennan, as the administrator of the estate of his deceased brother, Earl E. Brennan, has brought this action against decedent's sister, Evelyn B. Carroll, to set aside the transfer of a bank account and various corporate stock certificates assigned to Mrs. Carroll by decedent during his lifetime.

The evidence discloses that decedent was an unmarried man who worked many years as an employee of the Post Office Department. He left surviving him his brother, John; his sisters, Evelyn Carroll, Cecil McWhinney, Bernice Kunz, and Phyllis Paul; and various nephews and nieces.

In the year 1956 Earl Brennan's illness was diagnosed as cancer of which he ultimately died on December 14, 1958. On Christmas Day 1956 he visited Mrs. Carroll and had dinner with her family, at which time defendant's husband, Lynn Carroll, discussed with decedent the advisability of Earl's receiving medical treatment either at the University of Minnesota Hospitals or at the Veterans Administration Hospital.

Decedent had outpatient treatment at the University of Minnesota Hospitals on December 17, December 18, December 19, December 20, and December 27, 1956. Although he was scheduled for surgery there in January 1957, he did not undergo the operation but instead entered the Veterans Administration Hospital on December 28, 1956, and remained there most of the time until his death. At both hospitals he represented himself as indigent.

On December 28, 1956, decedent went to the office of Brace Bennitt, a stockbroker in the firm of Piper, Jaffray & Hopwood, and delivered to Bennitt 200 shares of stock in the Minneapolis Gas Company, 200 shares of stock of Libby, McNeil & Libby, and 100 shares of stock in the Mountain Fuel Supply Company. The decedent, Earl Brennan, had endorsed the stock to his sister, Mrs. Carroll, and asked Bennitt "to have the securities transferred to his sister's account." Bennitt complied, later advised Mrs. Carroll when the securities had been returned to him from the transfer agent, and asked her for instructions concerning their disposition. She directed him to hold the stock certificates for her in safekeeping, which he did. They

have remained there ever since, with Mrs. Carroll receiving the dividends and purchasing additional stock with the income.

On April 10, 1958, during one of his periods away from the hospital, Earl Brennan opened a joint savings account with defendant, Evelyn Carroll, in the Marquette National Bank with a net deposit of $825.33. Both decedent and Mrs. Carroll executed signature cards authorizing either person to make withdrawals of a part or all of the account. There is a conflict in defendant's testimony as to when she received the bankbook, but it is apparent she had possession of it in the fall of 1958 and withdrew the balance of the account in the sum of $982.18 on April 9, 1959. Her activity with respect to the account before she closed it consisted of making deposits for decedent as his checks arrived at her house.

The plaintiff, as administrator, has sued defendant for reassignment of the stock and the bank account on the theory that these were not validly executed gifts and were, in any case, impressed with a constructive trust. It is plaintiff's claim that the transfers were not intended to benefit defendant but were intended to present a facade of indigence necessary to qualify decedent for free medical care. Defendant claims the gifts were legally sufficient to transfer title to her and denies that any conditions were attached to the transfers.

In support of his claim that the transfers were not absolute but were intended only to hide decedent's assets while he secured free medical care at public expense, plaintiff offered in evidence four exhibits designated as A, B, C, and D.

Exhibit A, written by decedent on November 12, 1958, because of his inability to speak, was offered, received, and relied on by the trial court to prove decedent believed he was the owner of the property in question long after the transfers to defendant were made. The exhibit is advice to his sister Evelyn to use his "account" and if necessary "stock" if money was needed for him and to distribute the balance among his brother, sisters, nephews, and nieces. The defendant objected to the admissibility of exhibit A on the ground it lacked proper foundation, on the ground of materiality in that it was not within the scope of the complaint, and on the ground that it was not relevant.

The court received the exhibit stating, "I will keep your objections in mind."

Exhibit B was a written inquiry made by decedent in September 1958 concerning the value of the stock here in question which the trial court felt permitted "a slight inference inconsistent with the claim of an outright prior gift of this stock." Defendant objected on the ground that it called for a conclusion, was self-serving, and immaterial. The court received the exhibit subject to the objection.

Exhibit C was an unexecuted memorandum prepared by defendant's husband for signature by decedent and recites that decedent had previously transferred stock to defendant as a gift and that the memorandum was designed to avoid any question about defendant's being the sole owner. This memorandum was never signed by decedent. Defendant's counsel at first stated he had no objection to exhibit C and it was received, whereupon he immediately stated: "I might make this objection for the purposes of the record, that I don't believe that the exhibit is material to any issues in this case, but I have no objection to the document itself." Whereupon the court said: "I will keep your objection as to the relevancy in mind."

Exhibit D was a memorandum executed in decedent's handwriting on October 14, 1958, in response to inquiries directed to him about exhibit C which, in exhibit D, he said was prepared by defendant's husband and which he said he intended to destroy. Exhibit D indicates decedent had resources to pay the medical expenses. Defendant objected on the ground of materiality, and the court received the exhibit with the remark: "You are presenting an awfully close question of evidence here, but I am going to receive it."

Decedent had no bank accounts or any stocks in his name at the time of his death except the joint bank account here in question. No claims were filed by the University of Minnesota Hospitals or the Veterans Administration and the estate was otherwise solvent.

The case was tried by the court without a jury and resulted in a decision that the transfers of stock and the bank account were not gifts but were impressed with a constructive trust.

■ The defendant has appealed from an order denying her motion for amended findings or a new trial and from a denial of her mo-

tion to delete those paragraphs of the findings which defendant asserted in her motion pertained to exhibits which were inadmissible in evidence "since they amount to the declarations of the grantor of a gift made after the gift was made." In my opinion, it was prejudicial error to deny defendant's motion since the exhibits were patently inadmissible both as hearsay and as impugning the title of a previous grantor. Without these exhibits the record compels a finding that the transfers were legally sufficient to vest title in defendant, free from any constructive trust. In any case, if the transactions were tainted with fraud, as plaintiff claims, equity should not be invoked to give the plaintiff relief.

The majority opinion holds that because the case was tried without a jury and the exhibits were received with reservations no reversible error occurred. However, it is clear from a reading of the trial court's memorandum that it treated this evidence as decisive in reaching the conclusion that decedent failed to make an absolute gift to defendant of the bank account and stock here in question.

Findings IX through XV all make specific reference to exhibits A, B, C, and D. The conclusion is inescapable that the trial court treated them as dispositive of the matter of intent. The court stated, among other things:

"* * * Considering 'A' and 'D' under these limitations to the rule, it is difficult to see any facts which they tend to prove except a state of mind or point of view on the part of decedent which is inconsistent with defendant's claim of a gift of the stock and the bank account to Evelyn Carroll. * * *

"* * * It [exhibit A] does indicate a belief on the part of Earl that on that date, about a month before his death, he was the owner of the property involved in this litigation. Somewhat the same inference, though not so strong, can be drawn from 'D.' * * *

\* \* \* \* \*

"Exhibit C presents more of a direct hearsay problem than the others but it is concluded that the exhibit was properly received under the exceptions just indicated. In any event, its probative weight is not

so great that its rejection would have changed the result of this decision.

\* \* \* \* \*

"Plaintiff's Exhibit C and the evidence relating to it, including the testimony of Lynn Carroll, is inconsistent with defendant's claim of a gift of the stock. This evidence may be somewhat negative in nature but if, as claimed by defendant, there had been an outright and completed gift of the stock, it is difficult to understand why decedent would have consistently refused to execute this instrument or some instrument that would have made his intention clear. This refusal is considered in the light of the failure discussed above to consummate the gift by delivery. Of course, Earl Brennan may have thought that he had done everything necessary to complete the gift but such an inference is so contrary to his subsequent acts, as well as the advice of Lynn Carroll, that it is rejected.

"Exhibit B is probably not too significant except that at the time decedent was still interested in the market value of the stock and it permits a slight inference inconsistent with the claim of an outright prior gift of this stock.

"Exhibits A and D are applicable to both the stock and the bank account. Both speak for themselves and appear so obviously consistent with plaintiff's contention that analysis seems unnecessary."

■ In view of the trial court's reliance on these exhibits, it is essential to consider not only their admissibility but whether defendant's objections were appropriate and timely and the status of the record if the exhibits are excluded.

The exhibits under consideration were all introduced by plaintiff and received and relied on by the court to prove that the decedent, subsequent to the creation of the joint bank account and the transfer of stock to defendant, made statements or took a position inconsistent with an absolute transfer. The rule in Minnesota has been stated in a number of cases and is in accord with the law elsewhere. In Dickson v. Miller, 124 Minn. 346, 350, 145 N. W. 112, 114, we held that declarations of a grantor to the effect that she retained the right to recall a deed, uttered subsequent to the delivery of the deed, were self-serving,

in derogation of the title of her grantee, and properly excluded. To the same effect are the decisions in Sons v. Sons, 145 Minn. 367, 370, 177 N. W. 498, 499, and Crispo v. Conboy, 153 Minn. 343, 344, 190 N. W. 541. The case of Russell v. Roach, 173 Minn. 314, 217 N. W. 115, involved a dispute, similar to the one here in question, where heirs to a grantor's estate asserted that a conveyance of real estate was impressed with a constructive trust for their benefit. We there held that conversations of the grantor after the transfer were hearsay, self-serving, and otherwise inadmissible as impugning the title of the subsequent owner, stating (173 Minn. 320, 217 N. W. 117):

"* * * These conversations were several years after she had parted with all title to the properties, and the statements made were clearly inadmissible on several grounds. They were within the hearsay rule. So far as they implied that the property was held in trust for her or her appointees, they were self-serving. Furthermore, it is thoroughly settled that statements impugning the title of the present owner made by a former owner after he has parted with his title are not admissible in evidence against the present owner."

The same rule applies to the assignment of personal property. Roach v. Halvorson, 127 Minn. 113, 148 N. W. 1080, involved the validity of a promissory note which defendant claimed was procured by fraud and without consideration. The trial court permitted a third person to testify to a conversation with one of the payees occurring long after the note had been transferred to plaintiff, in which the payee admitted fraud in the procurement. Our court held that the objection that it was incompetent and hearsay should have been sustained, and the matter was reversed. We said (127 Minn. 116, 148 N. W. 1081):

"* * * It is well settled law in practically all of the states of this country, and of England, that declarations and admissions of a former owner of property, tending to defeat his title, made after a transfer thereof to a third person, are inadmissible against his transferee or successor in interest."

Our decision in Troseth v. Troseth, 224 Minn. 35, 28 N. W. (2d) 65, allowed declarations of a grantor to be received in evidence on the

question of delivery only. If it is construed to permit evidence of intent to convey title expressed subsequent to the transfer, it is at variance with all of our previous decisions.[1]

It is apparent from an examination of the authorities in Minnesota and elsewhere that even if Earl Brennan were alive and able to take the stand and testify under oath as to what his intent was in December 1956 and in April 1958, his testimony under the rules discussed would be inadmissible. The error is compounded by the use of statements by him which are not made under oath or subject to cross-examination. Our court in discussing the inadmissibility of a previous grantor's statements impugning title refers to such evidence as incompetent and self-serving. In the instant case they are also hearsay. Both the trial court and counsel were preoccupied with whether or not the exhibits violated Minn. St. 595.04, and the trial court correctly concluded that they did not. There was no other discussion by court or counsel concerning hearsay or the rule against impugning title until the court filed its memorandum and defendant made her motion to delete portions of the findings. However, the trial court observed in its memorandum that the exhibits had been received with reservations and "fairness indicates that the objection be considered" with respect to the question of hearsay. The court then proceeded to dispose of the problem without applying the doctrine announced in the Dickson, Russell, Roach, and other cases, *supra*.

■ Where, as in this case, the hearing is held by the court without a jury and does not require a new trial, and the precise question involved on appeal was presented to the trial court before the case was finally submitted, there appears to be no sound reason why the matter should not be remanded for further consideration by the trial court, based on the exclusion from evidence of the offending exhibits, and permitting additional testimony to be adduced if need be. It is apparent from the court's memorandum that it relied on evidence which it erroneously assumed was admissible and that the result might well have been different if the exhibits had not been received.

■ As the record now stands, if exhibits A, B, C, and D are ex-

---

[1]See, also, Annotations, 156 A. L. R. 1335 and 1 A. L. R. 1240, 1241.

cluded, the evidence will not support a finding that either the bank account or the corporate stock now in defendant's name was an incomplete gift or impressed with a constructive trust. With respect to the creation of a joint bank account by decedent, Earl Brennan, under Minn. St. 48.30 as construed in Dyste v. Farmers & Mechanics Savings Bank, 179 Minn. 430, 229 N. W. 865, there is a presumption that the residue of a joint account is the absolute property of the survivor, and the burden is on plaintiff to prove that this was not the intent of the donor. In Zigan v. LeBlanc, 191 Minn. 538, 254 N. W. 810, we refused to overrule our previous decisions to the same effect. Much is made by the plaintiff of the fact that defendant did not actively use the account until after decedent's death, and that she did not have possession of the bankbook until September 1958. These matters are not decisive, however. It is the *right* to withdraw which governs, and as we held in the Dyste case, it is immaterial who actually keeps the passbook. In this connection the auditor of the Marquette National Bank testified as follows:

"Q.   That is a complete joint account and either party could withdraw the entire balance if they so desired at any time, isn't that correct?
"A.   Yes, sir."

Absent the inadmissible exhibits, there is nothing in the record to rebut the presumption that defendant had a right to the residue of the account and, unless such evidence were adduced at a further hearing, defendant is entitled to the proceeds as a matter of law. This conclusion seems to be supported by the trial court's statement in his memorandum:

"* * * While the question is not entirely free from doubt, it is concluded that plaintiff's evidence discussed above is sufficient to overcome the presumption, and that the essentials of a gift of the savings account have not been established."

■   As far as the transfer of stock from decedent to defendant is concerned, a more difficult question arises. There is no Minnesota case precisely in point. However, we have held on various occasions that a valid gift may occur by delivery to a third person, and once accom-

plished, such delivery may not be revoked. Dickson v. Miller, *supra.* Nor is there any necessity for notice to the donee if the gift is otherwise complete. Larkin v. McCabe, 211 Minn. 11, 299 N. W. 649. In the Larkin case, securities were delivered to a third person and redelivered to the donor who subsequently attempted to transfer them elsewhere. Our court held that the initial gift was complete and could not thereafter be revoked. A more nearly parallel situation occurred in Innes v. Potter, 130 Minn. 320, 153 N. W. 604, 3 A. L. R. 896. That suit involved a claim by a representative of an estate where decedent had delivered corporate stock to a third person, retaining a life interest but instructing the third person to hold the certificates and to deliver them to the defendant on decedent's death. The opinion recites that decedent had written a letter to the defendant in which he stated "that he had transferred this stock to her." The trial court's finding of an absolute gift with enjoyment postponed was affirmed. In the instant case the decedent also made actual delivery to a third person, Mr. Bennitt, the stockbroker, but the only instructions he gave to the broker were "to have the securities transferred to his sister's account," decedent having already endorsed the certificate to defendant for that purpose in an appropriate manner. In my opinion, the surrounding circumstances under the present state of the record require a finding that there was sufficient delivery. Decedent never again exercised any dominion or control over the stock, received none of the dividends, and made no demand for an accounting of them. The only reason the certificate remained in actual custody of the broker was because of instructions given him by the defendant, not by decedent. I do not believe that if the circumstances otherwise support a gift, the transaction should be defeated because of the failure of the donor to use the legalistic expression, "delivery." This is part of a lawyer's vocabulary, while the term "transfer" is more familiar to a layman. In ordinary usage, to "transfer" title suggests to a layman a completed transaction, including delivery, and no particular significance should be attached to decedent's failure to use the ritualistic language of the law.

In re Declaration of Trust by Bush, 249 Minn. 36, 81 N. W. (2d) 615, 82 N. W. (2d) 221, is not particularly helpful. There the transferor retained possession and made no delivery of any kind, and we

held that title did not pass. However, it should be borne in mind that in the instant case the broker did not initially have the certificates of stock and did not get possession of them until they were actually delivered to him by the decedent himself. To use the language of the Bush case, this was, in my opinion, a sufficient (249 Minn. 48, 81 N. W. [2d] 623) "symbol of a transfer of title between the parties" to complete the gift.

It is significant that under the Uniform Stock Transfer Act there is no requirement that a certificate be delivered to the transferee in person in order to pass title. Our statute merely provides that there shall be delivery and that it be accompanied either by endorsement or a separate assignment. Minn. St. 302.02. Our common-law rule with respect to delivery through a third person has not been affected by the statute.

■ . It may well be that decedent's unexpressed motive for transferring stock to defendant and creating a joint bank account in her name was to conserve his assets for a member of his family, while at the same time qualifying himself for medical care at public expense. While I do not believe there is competent evidence to support this theory, it would not in any case impress the gifts with a constructive trust unless the donee herself was a party to the fraudulent transaction. The record is completely barren of any evidence that defendant had knowledge of an ulterior motive on the part of decedent in making these transfers, or that she herself was instrumental in creating the illusion of indigence.

There is abundant evidence that Mrs. Carroll was the particular object of decedent's bounty and enjoyed his special confidence. She made almost daily visits to the hospital while he was ill. He used her home as a mailing address for the various pension checks which were sent to him while he was ill, and it is undisputed that on October 7, 1957, he made a gift to her of $3,000 which plaintiff concedes was validly executed and without any conditions attached. While Lynn Carroll's interest in the case cannot be ignored, he testified at considerable length to conversations with the decedent in which the decedent expressed particular concern for the defendant, stating "he wanted her to have everything, because she had been very close to him throughout

the years and perhaps was the only one that understood him." According to Lynn Carroll, Earl Brennan stated that his motive for the transfer of stock was to avoid some of the disagreeable occurrences which accompanied the death of decedent's mother. Lynn Carroll further testified that decedent expressed some resentment over treatment he had received at the hands of one of his other sisters. In view of this undisputed testimony, the preponderance of the evidence seems to indicate that there were compelling reasons for finding decedent intended outright gifts to defendant.

A transfer of property without consideration gives rise to an inference that it is intended as a gift. Restatement, Trusts, § 405, *comment a*. Unless the inference or presumption is rebutted by plaintiff, the transfers are absolute, and an intent will be presumed. On the other hand, if under the law or facts no intent to create a gift of the stock is present, title remains in the decedent's estate, and there is then no occasion to impress the stock with a so-called constructive trust. Likewise, as to the bank account, if the presumption of a gift is rebutted, the defendant never did have title to the account and a constructive trust doctrine need not be invoked. It is only where valid title is passed, but the grantee is in good conscience obliged to recognize a moral obligation to deal with the property for the benefit of others, that the equitable concept of a constructive trust comes into play. All of the Minnesota cases which discuss the doctrine require participation by the grantee in some kind of wrongdoing involving his own fraud or bad faith. Knox v. Knox, 222 Minn. 477, 25 N. W. (2d) 225. The doctrine has sometimes been described as one designed to prevent the abuse by defendant of a confidence or trust bestowed under a fiduciary relation to plaintiff's harm. Wilcox v. Nelson, 227 Minn. 545, 35 N. W. (2d) 741. See, also, Petersen v. Swan, 239 Minn. 98, 57 N. W. (2d) 842; Borsgard v. Elverum, 248 Minn. 405, 80 N. W. (2d) 604. We have stated that even in the absence of fraud and a fiduciary relationship a constructive trust may arise simply to prevent unjust enrichment. However, no Minnesota case has come to my attention where an innocent grantee, without knowledge of the grantor's ulterior purposes and without participating in their accomplishment, has been required to

disgorge property transferred to the grantee if he otherwise has received all of the attributes of title.[2]

▮ If we adopt plaintiff's theory of the case and grant the relief prayed for, we will be lending our judicial aid in furtherance of a fraudulent scheme designed to hide assets from decedent's potential creditors. This is an equitable action in which the complaint prays that the transfers to defendant be set aside. The order appealed from directed that defendant deliver to plaintiff the stocks here involved and the proceeds of the bank account. In my opinion, the plaintiff is barred from recovery by the doctrine that he who comes into equity must come with clean hands. Plaintiff's entire cause of action is based on the premise that the transfers were not absolute because they were made only for the limited purpose of creating an appearance of poverty sufficient to qualify decedent for free medical service. The complaint euphemistically alleges the transfers were "for safekeeping during the time he was to be under medical care," and "for the purpose of *protecting* said assets *against* creditors." (Italics supplied.) Plaintiff alleges the action is brought under Minn. St. 525.391 "to set aside the fraudulent transfer to Defendant." In his opening statement, counsel for plaintiff reiterated that transfers from decedent to defendant were for "safekeeping" and "for the purpose of preserving it [the bank account] from creditors." In the course of examining the plaintiff, his counsel stated to the court that his inquiry was material "insofar as the cause of action concerning the transfer of assets to defraud creditors is concerned." In examining the assistant chief registrar of the Veterans Administration Hospital, counsel for plaintiff elicited testimony that a person able to pay for treatment would not be admitted and that decedent was in fact admitted. To the same effect was the testimony of the record librarian of the University of Minnesota Hospitals who stated that her records disclosed that Mr. Brennan was an indigent patient. The trial court made a finding as follows:

"In December, 1956, Earl E. Brennan learned that he had cancer of the throat and during that month he made a number of out-patient

---

[2]See, Jennings and Shapiro, *The Minnesota Law of Constructive Trusts and Analogous Equitable Remedies,* 25 Minn. L. Rev. 667.

visits to the University Hospital and made tentative arrangements for an operation for this condition at this hospital. During these visits he represented that he was financially unable to pay the expenses of the operation and it was suggested that he arrange to be admitted as a county patient. At the time Earl E. Brennan was able to pay for such operative expenses as he was then the owner of certain stock worth about $10,000, moneys in excess of $3,000, and he was receiving certain pension checks at regular intervals."

In addition the court found that decedent was not qualified to enter the Veterans Administration Hospital unless he signed a statement that he was financially unable to pay for the cost of hospital treatment. Finally, in the court's memorandum the following conclusions were reached:

"* * * The inference is justified that a motive for acting as he did was the desire to secure free medical attention by placing himself in a position where it could not be established that he could pay for such attention."

Our court has heretofore recognized and applied the so-called "clean hands" doctrine. In Johnson v. Freberg, 178 Minn. 594, 228 N. W. 159, the plaintiff sought, among other things, to have conveyances by defendants set aside as fraudulent. The defendants set up the defense of fraud on the part of plaintiff, and we sustained the trial court's decision granting relief to neither party. In that case the trial court found that plaintiff was not guilty of legal fraud but found his conduct was inequitable and barred his recovery. We stated the rule to be thus (178 Minn. 597, 228 N. W. 160):

"The equity rules, that he who seeks equity must do equity and that he who comes into equity must come with clean hands, are recognized and followed by all the courts. The application of those rules to the facts in any particular case is not without difficulty. The limits of the rules are not well defined. These rules or maxims operate to deny relief to or from conduct which is fraudulent, illegal or unconscionable. The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. The plaintiff may be denied

relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others."

With respect to a contract in fraud of creditors, Williston states the rule to be as follows:

"* * * if a fraudulent transferor sues for the price he should not be allowed to recover, whether the parties intended a permanent transaction or the fictitious appearance of one." 6 Williston, Contracts, § 1739.

The Supreme Court of the United States had occasion to consider the doctrine in Precision Co. v. Automotive Co. 324 U. S. 806, 65 S. Ct. 993, 89 L. ed. 1381. That action involved a fraudulent patent application, and the court had this to say about actions involving the public interest (324 U. S. 814, 65 S. Ct. 997, 89 L. ed. 1386):

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' * * * Thus while 'equity does not demand that its suitors shall have led blameless lives,' * * * as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. * * *

"This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' * * * Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

"Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance."

There are a number of other cases in which courts have denied equitable relief where the grantor's actions were prompted by an improper and unconscionable motive to evade such public obligations as real estate or income taxes. In the case of Delgado v. Delgado, 42 N. M. 582, 82 P. (2d) 909, 118 A. L. R. 1175, the plaintiffs brought an action to set aside a conveyance of real estate the sole purpose of which was to cloak defendant with the false appearance of title in order to realize the benefits of a tax reduction conferred on honorably discharged soldiers. The complaint asked that defendant be deemed a trustee for the grantor's heirs. The New Mexico court held that if the sole object of the transfer was to defraud the state of revenue, the heirs of the grantor succeeded to no rights which were superior to those of the grantor at the time of her death. In discussing the maxim that a right of action cannot arise out of a fraud, the court quotes from 2 Moore, Fraudulent Conveyances, p. 630, to the effect that parties to a transaction tainted with fraud shall be left by the courts in the situation in which they have placed themselves, without aid from the courts; and while the transaction may be set aside by defrauded creditors, it is binding on the parties and persons claiming under them. Hence, the decision of the trial court setting aside the deed in the Delgado case was reversed.[3]

Many of the problems raised in the instant case are treated in an exhaustive opinion of the Iowa court in Shaw v. Addison, 239 Iowa 377, 28 N. W. (2d) 816. That action involved proceedings by the administratrix of a grantor's estate against the decedent's sister to set aside a number of stock transactions. The court held the plaintiff was

---

[3]See, Annotation, 118 A. L. R. 1184.

required to prove that the transfer was impressed with a trust in decedent's favor by clear, convincing, and satisfactory evidence. The Iowa court stated that an absolute gift cannot be cut down into a trust by events transpiring *after* it is made. It ruled that the decisive factor is the character of the transaction at its *inception,* and it is not to be determined by subsequent acts or declarations. It was the position of the administratrix that the sole purpose of the transaction was to escape income taxes. The Iowa court observed that equity would not decree a reconveyance on the presumption the donee had promised to return the property after the taxes were successfully evaded. The court further considered the position of the administratrix of the estate with respect to decedent's wrongdoing, and held that as representative of the donor, plaintiff had no rights superior to those which the donor enjoyed at the time of his death. Neither the grantor, his representative, heirs, or assigns may recover in this situation. Englund v. Berg, 70 S. D. 334, 17 N. W. (2d) 638.

In conclusion, it is the law that a representative succeeds to the disabilities of his decedent; that he has no standing in court to seek affirmative relief if decedent himself had unclean hands; and that under such circumstances equity will leave the parties where it finds them. This matter should be reversed and remanded with directions that the trial court strike exhibits A, B, C, and D from the record; that it permit the parties to offer any other admissible testimony bearing on the issue of decedent's intent or lack of intent to transfer the property here in question; that it allow argument on the equitable doctrine of unclean hands which is here discussed but which was neither presented to the trial court for consideration nor argued on appeal; and that it reexamine its findings of fact and conclusions of law in the light of the rules of law set forth herein.