## HOLLAND AMERICA INSURANCE COMPANY v. JAMES W. BAKER AND ANOTHER.

139 N. W. (2d) 476.

December 17, 1965—No. 39,723.

---

474

*Mordaunt, Walstad, Cousineau & McGuire,* for appellant.

*Smith, Munro, Orr & Milavetz* and *Harlan E. Smith,* for respondent Baker.

*Ryan, Kain, Mangan, Westphal & Kressel* and *James J. Moran,* for respondent Plude.

FRANK T. GALLAGHER, C.

This is an appeal from a judgment of the district court.

The action was brought by Holland America Insurance Company

against James W. Baker, its insured, and Leo Plude, who was involved in an accident with insured, for a declaratory judgment construing an automobile liability insurance policy to determine whether its "temporary substitute" provision afforded protection to the insured during his operation of a nondescribed automobile. The trial court held in the affirmative.

On April 1, 1963, Max Gary, agent for the company, personally accepted an application for automobile insurance from the insured. The company writes only minimal risk coverage policies. The policy here involved was issued by the company after Gary was told that the State of Minnesota had required the insured to file an SR 22 form before a driver's license would be issued to him. The policy was effective from April 1, 1963, to October 1, 1963. Baker was the named insured and the described automobile covered under the policy was a 1952 Buick 4-door sedan. The policy limited bodily injury liability coverage to $10,000 for each person and $20,000 for each accident, and property damage liability to $5,000 for each accident. The total premium for the coverage extended by the company was $175 for 6 months.

The 1952 Buick described in the policy had been purchased by the insured on March 28, 1963, from Breitman Auto Company. On April 2, 1963, it was traded for a 1953 DeSoto. On April 8, 1963, the insured purchased a 1955 Oldsmobile from Riviera Motors. On April 26, that year, he traded the DeSoto for a 1956 Ford. Toward the end of April or early in May 1963 he bought a 1955 Buick.

Only the facts surrounding the 1956 Ford, 1955 Buick, and 1955 Oldsmobile are important for our consideration. At the time of the accident in question, the 1956 Ford was beyond repair and had been repossessed by Breitman. This precludes any possibility of coverage or liability by the company for the Ford.

In the latter part of April 1963, Baker, the insured, was desirous of purchasing a car as a gift for Miss Jackson, his fiancee, so he contacted a Mr. Williams, the owner of the 1955 Buick. After preliminary negotiations were concluded, it appears that Baker and Miss Jackson agreed to purchase the car. The downpayment was $50, of which Baker paid about $35 and Miss Jackson paid the balance. Baker also agreed to pay $50 each payday until a total of $200 was paid.

Baker testified that he discussed the purchase of the Buick with Miss Jackson and indicated to her that he would do the "bargaining" for the car in her behalf, but that the car was to become her car, not his. He said that he had an automobile at that time, the 1955 Oldsmobile which he had up until then been driving, and that the money he spent toward the payment on the 1955 Buick was a gift from him to Miss Jackson. Baker and Miss Jackson shared the expenses and upkeep on the Buick but it was kept at her residence. Baker testified that he usually had to get her permission to use it, and that he was teaching her to drive it.

Williams retained the title card to the Buick, but could not find it at the time he testified. He said that the only information he put on the back of the card was his name and signature as the seller and the date it had been purchased; that he sold the car to Baker, who took it away the same day, but that Baker never came back to get the registration card.

None of the foregoing purchases or trade-ins, nor the accident of June 6, 1963, which gave rise to this action, were reported by Baker to the company or the insurance agent.

On the day of the accident, Baker had advised Miss Jackson that his Oldsmobile was not in running order, and so he asked her if they could use the 1955 Buick for their outing. She agreed and was a passenger in the car, which Baker was driving, when the accident occurred.

Baker testified that he purchased the 1955 Oldsmobile and that it was the car he considered as his own. There was testimony that on June 6, 1963, it was about to throw a rod, the lifters were badly worn, and it was not in satisfactory working condition. Baker said that the last time he attempted to drive the Oldsmobile on or before June 6, 1963, he had driven within two blocks of Miss Jackson's house when the car stalled and wouldn't start again, so he had to have it pushed to her home; that he had not driven it since.

Miss Jackson testified that when she first looked at the Buick with Baker she told him that she wanted the car as her own. She testified that she thought she furnished about $15 of the downpayment; that she knew Baker owned the 1955 Oldsmobile which was in front of her house on June 6; that it could be "turned on" but she didn't know if "you could drive it"; that she did not have a driver's license but Baker was teaching

her to drive; and that he told her on that day that the Oldsmobile was not running. She said that she asked her permission to use the Buick for a trip they were making that day because his car wasn't working and "I told him yes." She further testified that from the first time she saw the 1955 Buick until the accident of June 6, 1963, "I thought it was mine," because Baker said on the day he got the Buick that it was her car. She also said that he told her he was going to give it to her as a gift. She was asked on cross-examination if she didn't generally refer to the 1955 Buick as "Jim's car." She replied, "No. I have always thought it was mine. He had a car."

In that connection an attempt was made on cross-examination to impeach this testimony by a statement taken from the witness by James Pinkerton, an insurance adjuster. In explaining her reference in the statement to "Jim's car," Miss Jackson said that the adjuster asked questions; that the things he was writing were his words; that he did not take down verbatim what she said.

Sam Sims, a witness for the company, testified that in April 1963 while employed as a salesman for Riviera Motors, Minneapolis, he sold Baker a 1955 Oldsmobile, which he assumed was paid for in full. The attorney for defendant Plude notified the court that for the purposes of the trial he was willing to stipulate that Sims sold Baker the 1955 Oldsmobile in April 1963 and that he was still the owner of that car on June 6, 1963.

The trial court determined that a declaratory judgment should be entered that Baker owned a 1955 Oldsmobile on June 6, 1963, which was a replacement automobile insured under the terms of the company policy; that on said date Irene Jackson was the owner of a 1955 Buick that was being driven with her permission and consent by Baker; that it was a "temporary substitute automobile" within the meaning of the policy; and that the policy affords full policy coverage to Baker for legal damages proven against him as a result of his unlawful, negligent, and careless actions in the accident of June 6, 1963. The company assigns as error that the court's findings are not sustained by the evidence.

The company contends that Baker was in fact the owner of the Buick, or at least a part owner, so as to be excluded from coverage under the

terms of the policy. The company argues that the Buick was registered in the name of Charles Williams; that the transaction to purchase the automobile was made between Baker and Williams; that it was Baker who paid over two-thirds of the downpayment and obligated himself to pay the balance of the purchase price; that it was Baker to whom Williams sought to give the title card and who drove the car when it was in use. The company further argues that if the Buick was in fact a gift to Miss Jackson, the whole transaction was only a sham so that Baker would be able to drive an automobile without having to pay the high premium of risk insurance. It contends that Miss Jackson was never a party to the purchase of the Buick; that she never paid the balance of the purchase price; that she never exercised any element of control in the sense that she drove the automobile and used it for herself; and that she didn't even have a driver's license.

The question of ownership is a question of fact. Upon review we must examine the evidence to determine whether there was a reasonable basis for the trial court's finding on this issue. Hoverson v. Hoverson, 216 Minn. 237, 12 N. W. (2d) 497.

■ Defendants contend that Miss Jackson acquired ownership of the Buick by virtue of a gift from Baker. The general requirements necessary to sustain the presence of a gift are (1) delivery, (2) intentions, and (3) absolute disposition by the owner of the thing he intends to give to another. See, Brennan v. Carroll, 260 Minn. 521, 111 N. W. (2d) 229.

There is evidence in this case that after the car was purchased it was delivered to Miss Jackson's residence and it appears that it remained there at all times except when she claims she was taking driving lessons or loaned it to Baker. These facts would constitute delivery as required by law. The testimony of Baker indicated that it was his intention to purchase the car for Miss Jackson as a gift and that he had no ownership or property rights in the car, even though he would be paying the majority of the purchase price, as Miss Jackson was to exercise control. He claimed that he usually had to ask permission to use the car, which indicates the domination Miss Jackson exercised over it. There was also evidence to indicate that Miss Jackson accepted the car as a gift. The court found that her ownership arose by way of a gift from Baker.

The principles with respect to giving an automobile as a gift were set out in State v. One Buick Sedan Automobile, 216 Minn. 129, 12 N. W. (2d) 1. In that case the husband paid part of the purchase price of the car and his wife the other part of the price. The car was registered under a name not indicative of either the husband or wife. The court in holding that a gift was intended and delivered to the wife stated (216 Minn. 133, 12 N. W. [2d] 3):

"* * * The fact that the husband paid all or part of the consideration for a transfer to his wife 'is more than merely a circumstance tending to rebut the inference of a resulting trust. It is of itself a circumstance sufficient to raise an inference that a gift was intended.' 2 Restatement, Trusts, § ˙442b. While a presumption may be rebutted, it controls decision where it is not displaced by substantial evidence."

The presumption in this case, created by Baker's payment, is even stronger than in State v. One Buick Sedan Automobile, *supra.* Here, Baker and Miss Jackson were not even married when Baker made payment of part of the car's purchase price. The presumption created, as well as the direct testimony of both Baker and Miss Jackson, remains uncontradicted. Their testimony stands alone without any substantial evidence and absolutely no direct evidence contrary to the presumption of gift raised. The court was therefore justified in its finding.

In Midden v. Allstate Ins. Co. 7 Ill. App. (2d) 499, 129 N. E. (2d) 779, cited by the company, the insured claimed that the car he was driving, which was involved in an accident, was not his and should be looked upon as a temporary substitute vehicle. The court disagreed and found acts which created ownership of the car. It appeared there that the insured purchased the car, took an assignment in his own name of the certificate of title, executed a chattel mortgage warranting that he owned the car, and received title registration and license plates from the state in his own name. The fact situation distinguishes that case from the instant case.

In Mid-Continent Cas. Co. v. West (Okla.) 351 P. (2d) 398, the court held that where the described automobile, normally used for trips, had badly worn tires but such tires were usable for local use, the borrowing of another car because of the condition of the tires was sufficient to

make said other car the "temporary substitute" and thereby covered by the insured's liability policy. The court said (351 P. [2d] 400):

"* * * Under the reasonable and liberal interpretation that must be given the 'temporary Substitute automobile' provision, its wording does not mean that the insured's own car, or the 'described automobile', must be disabled from all use."

Both Baker and Miss Jackson testified that the 1955 Oldsmobile belonging to Baker was not in normal condition. While there is no expert testimony to substantiate these contentions, there is also no evidence to the contrary. The evidence in the record therefore reasonably justified the finding made by the trial court.

The company points out that in the statement taken by the insurance adjuster Miss Jackson referred to the 1955 Buick as "Jim's car." In that connection she admitted that she made the statements but explained that the actual words written on the statements were the adjuster's interpretation of her words. The trial court had an opportunity to observe the statements and also hear the explanation of the discrepancy between her testimony and the statements. The court determined that Miss Jackson was the owner of the Buick and we cannot, under the record here, set aside that determination, as it was for the trial court to judge the credibility of the witness.

■ The final problem we must consider is whether the 1955 Buick served as a "temporary substitute automobile" within the meaning of the policy. This court has set out certain guidelines to be followed in construing provisions of automobile liability insurance policies. In Quaderer v. Integrity Mutual Ins. Co. 263 Minn. 383, 387, 116 N. W. (2d) 605, 608, this court said:

"In construing the terms of the policy, it must be kept in mind that the public has an interest in having automobiles covered by liability insurance. Further, it is well settled that any ambiguous terms of an insurance policy are to be construed in favor of the insured and against the insurer who is charged with having chosen the language of the policy. * * * Thus the policy should be construed to effect coverage if this can be done without violence to its plain language and underlying purpose."

In Gabrelcik v. National Ind. Co. 269 Minn. 445, 447, 131 N. W. (2d) 534, 535, we said:

"We recognize that the overall purpose of a substituted-vehicle clause in an insurance policy is to benefit the insured and that the clause is to be construed liberally in favor of the insured."

An examination of the record satisfies us that there was evidence from which the court could determine that the Buick was a temporary substitute automobile within the provisions of the company's policy.

It is obvious from an examination of the policy that the company sets the rate for the coverage afforded and that in doing so it contemplated the possibility of the described vehicle's being temporarily disabled, as was Baker's Oldsmobile. It therefore follows that the company is doing nothing more than fulfilling its contractual obligations. It is our opinion that it is not prejudiced under the findings of fact and conclusions of law made by the trial court.

Affirmed.